KAISER ALUMINUM AND CHEMICAL CORPORATION, a corporation, Plaintiff,

v.

The UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION et al., Defendants.

Civ. A. No. 76-44.

United States District Court, D. Delaware.

May 27, 1976.

Charles S. Crompton, Jr., Potter, Anderson & Corroon, Wilmington, Del., Arnold M. Lerman, and Ronald J. Greene, Wilmer, Cutler & Pickering, Washington, D. C., Max Thelen, Jr., Fredric C. Nelson, and Kennedy P. Richardson, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., Robert W. Turner, and Dennis M. Day, Kaiser Aluminum & Chemical Corp., Oakland, Cal., for plaintiff.

W. Laird Stabler, Jr., U. S. Atty., Wilmington, Del., Thomas S. Brett, and Edward B. Craig, IV, U. S. Dept. of Justice, Washington, D. C., Michael A. Brown, and David Schmeltzer, U. S. Consumer Product Safety Commission, Washington, D. C., for defendants.

## OPINION

STAPLETON, District Judge:

On October 27, 1972, the Consumer Product Safety Commission ("CPSC" or "the Commission") was launched pursuant to the Consumer Product Safety Act ("CPSA" or "the Act"). The CPSC was given regulatory authority over "consumer products" as defined in the Act.[1] That regulatory authority included the power to "collect, investigate, analyze, and disseminate injury data, and information" regarding hazards associated with consumer products.[2] It also included the power to develop safety standards respecting the products under its jurisdiction,[3] and to promulgate these standards by rule where "reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with such product."[4] In addition, the Commission's authority included the power, after conducting an adjudicatory-type hearing, to declare appropriate products to be "substantial product hazards" with certain potentially dire consequences to the products in question and their manufacturers and sellers.[5]

About a year after it came into existence, the Commission made an official determination that it had jurisdiction "to deal with those hazards to consumers which may result from the use of aluminum wiring in homes."[6] Soon after that decision the Commission contracted with the National Bureau of Standards for the assistance of its Technical Analysis Division ("TAD") in evaluating the safety of aluminum wiring.[7] Then, in the Spring of 1974, the Commission held public hearings in Washington, D. C.,

1. 15 U.S.C. § 2052(a)(1).

2. 15 U.S.C. § 2054(a).

3. 15 U.S.C. § 2056(b).

4. 15 U.S.C. § 2058(c)(2)(A).

5. 15 U.S.C. § 2064.

6. Defendants' memorandum in opposition to plaintiff's motion, Doc. No. 17, Exh. B.

7. Aff. of J. J. Cashel in support of plaintiff's motion, Doc. No. 6, at ¶ 3.

and Los Angeles, California, on the subject of "fire hazards associated with electrical wiring systems utilizing aluminum conductors".[8]

July of 1975 found the Commission deciding to make a public statement about what it had come to call the "aluminum wiring problem". In an issue of N.E.I.S.S. News,[9] an official publication of the Commission, it was stated that:

> Electrical failures in homes wired with aluminum have become a matter of concern for the U.S. Consumer Product Safety Commission. The Commission has received almost 500 reports of aluminum wiring incidents involving electrical malfunctions that have occurred in single-family dwellings between 1967 and 1975. Most of the reported aluminum wiring electrical failures resulted in damage to the electrical component or to the structure rather than resulting in injury.

.  .  .  .  .

Data on aluminum wiring hazards were gathered primarily through CPSC area offices by investigators who followed up on leads from outside sources. The major sources of electrical failure reports involving aluminum wiring have come from individual consumers, home owner and tenant associations, fire marshals and electrical inspectors, and the National Fire Protection Association. Many complaints involving aluminum wiring were received by the Commission's hot line from the New York area after an article on aluminum wiring appeared in a local newspaper.

The reports received by the Commission recorded damage ranging from the failure of an electrical component to fires resulting in 12 deaths and over a quarter of a million dollars in property damage. .  .  .[10]

It next developed that, on August 7, 1975, the Commission voted unanimously to commence a safety standard development proceeding respecting "aluminum wire in sizes AWG No. 10 and smaller and devices intended for use with it in branch circuits. .  .  ."[11] and, by a split vote, to prepare for the commencement of a "substantial product hazard" proceeding respecting "'old technology' aluminum wire[12] in sizes AWG No. 10 and smaller and wiring devices intended for use with, or that could reasonably have been expected to be used with, 'old technology' wire in new installations."[13] These actions were followed in September, 1975, by the publication of a document called a "Technical Fact Sheet", which stated in part:

> There is a potential fire hazard with aluminum which can develop in the following steps:
>
> —an oxide film which does not conduct electricity forms naturally on aluminum.
>
> —unless electrical connectors adequately maintain current flow through breaks in the oxide film, electrical resistance can build up and cause sustained overheating.
>
> —the overheating can lead to rapid destruction of insulating material which can cause a fire.
>
> The U.S. Consumer Product Safety Commission has collected data on approximately 500 incidents involving aluminum wiring that occurred in single family dwellings, mobile homes, and multi-family dwellings between 1967 and 1975. The data includes some reports of fires with extensive structural damage to the home. Twelve deaths were reported. The Commission has conducted research and test-

---

8. Defendants' memorandum in opposition to plaintiff's motion, Doc. No. 17, Exh. E.

9. National Electronics Injury Surveillance System, a Commission organ.

10. Defendants' memorandum in opposition to plaintiff's motion, Doc. No. 17, Exh. K.

11. Branch circuits are those circuits of household wiring running from the fuse box to individual components and/or convenience outlets.

12. "Old technology" wire is wire manufactured before 1971.

13. *Id.*, Exh. J.

ing through the National Bureau of Standards concerning the aluminum wire problem. . . .[14]

On November 4, 1975, the Commission issued the required public notice of the authorized safety standard development proceeding, in which notice the following statements were made:

Prior to August 1974, the Commission had received 165 reports of electrical failures involving aluminum wire. . . .

On August 29, 1974, an article discussing the hazards of aluminum wire was published in NEWSDAY, a Long Island, N.Y., newspaper. The article suggested that consumers report electrical problems to the Consumer Product Safety Commission's "hotline". Between August 29 and September 17, the Commission received 404 phone calls from the New York area relating to aluminum wire. 179 calls were from homeowners who had observed danger signals or had electrical malfunctions involving aluminum wire. . . .

Hazardous conditions such as burned wire insulation, burned receptacles, fires in receptacles or wall switches, odor of burning wires and smoldering in walls, and electric arcing of switches and receptacles were reported by 96 homeowners. Another 30 homeowners reported symptoms of hazardous conditions such as overheated receptacles and switches, scorched walls, and melted receptacles and wire insulation. 53 callers reported flickering lights or inoperative switches and outlets. The Commission's staff made follow-up investigations of HOTLINE calls from Medford, N.Y., and confirmed the validity of several reported incidents.

\* \* \* \* \* \*

The National Bureau of Standards (NBS) has performed laboratory studies for the Commission to determine what potential mechanisms of failure exist with aluminum wire and various connections. NBS reported that electrical fail-

ures and overheating can be reproduced with certain types of connections to aluminum wire.

The Commission, on the basis of the public hearing record, hazard analysis reports, hotline data and the NBS and other studies preliminarily determines that aluminum wire systems as defined in section C(1) of this notice present an unreasonable risk of injury.[15]

In conjunction with this notice of proceeding, the CPSC issued a written press release, stating in part:

The Commission has preliminarily determined that hazards associated with aluminum wire systems present an unreasonable risk of injury or death on the basis of testimony received at two public hearings held in Washington, D.C., and in Los Angeles in March and April 1974, research at the National Bureau of Standards, and hundreds of hotline calls and letters received from consumers detailing problems with aluminum wire systems. The Commission has collected reports of over 165 aluminum wiring failures and numerous aluminum wiring related fires.

Between August 29 and September 17, 1974, the Commission's hotline received 404 phone calls from the New York area in response to a newspaper article discussing the hazards of aluminum wire. Of those calls, 179 homeowners reported hazardous conditions such as burned wire insulation, burned receptacles, fires in wall switches, the odor of burning wires, overheated switches, scorched walls, and melted wire insulation.[16]

Sections 6(b)(1) and (2) of the CPSA, 15 U.S.C. § 2055(b)(1), (b)(2) provide, in part, as follows:

(b)(1) Except as provided by paragraph (2) of this subsection, not less than 30 days prior to its public disclosure of any information obtained under this chapter, or to be disclosed to the public in connection therewith (unless the Commission finds out that the public health and safe-

---

14. *Id.*, Exh. L.

15. *Id.*, Exh. M.

16. *Id.*, Exh. N.

ty requires a lesser period of notice), the Commission shall, to the extent practicable, notify, and provide a summary of the information to, each manufacturer or private labeler of any consumer product to which such information pertains, if the manner in which such consumer product is to be designated or described in such information will permit the public to ascertain readily the identity of such manufacturer or private labeler, and shall provide such manufacturer or private labeler with a reasonable opportunity to submit comments to the Commission in regard to such information. The Commission shall take reasonable steps to assure, prior to its public disclosure thereof, that information from which the identity of such manufacturer or private labeler may be readily ascertained is accurate, and that such disclosure is fair in the circumstances and reasonably related to effectuating the purposes of this chapter. If the Commission finds that, in the administration of this chapter, it has made public disclosure of inaccurate or misleading information which reflects adversely upon the safety of any consumer product, or the practices of any manufacturer, private labeler, distributor, or retailer of consumer products, it shall, in a manner similar to that in which such disclosure was made, publish a retraction of such inaccurate or misleading information.

(2) Paragraph (1) (except for the last sentence thereof) shall not apply to the public disclosure of . . . information in the course of or concerning any administrative or judicial proceeding under this chapter.

Relying on Section 6(b)(1), Kaiser Aluminum and Chemical Corporation ("Kaiser"), one of the principal manufacturers of aluminum branch circuit wiring, wrote the Commission on December 17, 1975, seeking a retraction of various aspects of the above-quoted statements of the Commission respecting this product and requesting, with respect to any future public statements,

pre-publication notice and opportunity for comment.[17] When Kaiser received no response from the Commission, this lawsuit ensued.

Kaiser argues that the Commission's publications of the N.E.I.S.S. news article, the Technical Fact Sheet, the Federal Register notice-of-proceeding, and the press release accompanying that notice [hereafter "the Commission releases"] were unlawful in that:

1. The notification and opportunity-to-comment procedures of Section 6(b)(1) were not followed.

2. The Commission failed, in further violation of Section 6, to take reasonable steps to assure the accuracy of the information disclosed in the releases.

3. The Commission further failed, in violation of Section 6(b)(1), to take reasonable steps to assure that the disclosures made in its releases were "fair in the circumstances" and "reasonably related to effectuating the purposes [of the Act]".

Kaiser seeks a preliminary and permanent injunction against any further instances of this alleged unlawful activity, along with a permanent injunction directing the CPSC to retract certain of the statements made in the releases.[18] In addition, Kaiser seeks a preliminary and permanent order restraining the CPSC from making any statements concerning aluminum branch circuit wiring or wiring systems (whether in conformity with Section 6(b)(1) or not), on the ground that aluminum branch circuit wire and wiring systems are not "consumer products" within the meaning of Section 3(a)(1) of the Act. For this reason, Kaiser maintains that any actions taken by the Commission with respect to such wiring are beyond the scope of its jurisdiction.

The Commission has moved to dismiss Kaiser's complaint, arguing that this Court does not, at least presently, have jurisdiction to hear Kaiser's claims and that, in any event, the provisions of Section 6(b)(1) are

---

17. Complaint, Doc. No. 1, Exh. A–1.

18. Kaiser concedes that it is not entitled to *pendente lite* relief by way of retraction.

inapplicable to the Commission releases in question. In response to Kaiser's claims, the Commission also argues that it *does* have jurisdiction over aluminum branch circuit wiring and wiring systems and that its actions to-date with respect to that product have been entirely lawful.

Presently before the Court are Kaiser's application for a preliminary restraining order and the Commission's motion to dismiss. On the record before me, I find I must deny both motions.

## I. THE COMMISSION'S MOTION TO DISMISS.

### A. *Jurisdiction.*

■ The Court has no doubt that it has jurisdiction to entertain Kaiser's claims. In *GTE Sylvania, Inc. v. Consumer Product Safety Commission*, 404 F.Supp. 352 (D.Del. 1975), the Commission had given notice of its intent to honor a Freedom of Information Act request for release of certain manufacturer-supplied data relating to television accidents. Various television manufacturers sued in this Court to enjoin release of the data on the grounds that the Commission had not taken sufficient steps to insure accuracy, fairness and purposefulness as required by Section 6(b)(1) of the Act. The Court reached the merits of that case, ruling it had jurisdiction to do so pursuant to 28 U.S.C. § 1337 which provides:

> The district court shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce . . . .

Given the similarities of the issues involved in this case and in *GTE*, the *GTE* ruling would appear to constitute a controlling precedent for the jurisdictional questions in

this case.[19] See also *A. O. Smith Corp. v. F. T. C.*, 530 F.2d 515, 519 (3rd Cir. 1976).

The Commission "concedes that had no further proceedings been planned by the CPSC regarding aluminum wire after the release of . . . [the] first two disclosures, . . . [the] court could review the agency action pursuant to the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706."[20] In the Commission's view, however, the fact that a safety standard development proceeding pursuant to Section 7 of the Act[21] is pending before it deprives this Court of jurisdiction. The Commission's argument apparently is that the standard development proceeding affects the propriety of this Court's involvement in three interrelated ways:

1. The pendency of the proceeding precludes there having been any "final agency action", on which to predicate judicial review.

2. The rule-making proceeding provides Kaiser with an administrative remedy which it must exhaust prior to seeking relief in this Court.

3. Under the scheme of the Act, once a rule-making proceeding has commenced, judicial review of all Commission actions with respect to the product involved is vested exclusively in the relevant court of appeals, pursuant to 15 U.S.C. § 2060(a).[22]

### 1. *Final Agency Action.*

■ As earlier noted, the Commission has several functions. One of these involves the collection and public dissemination of data regarding consumer product hazards. Another function involves the formulation of safety standards and their promulgation in rule-making proceedings. Kaiser here

---

**19.** Another basis for jurisdiction would be 28 U.S.C. § 1331. Kaiser's claims certainly involve interpretation of a federal statute, and Kaiser claims to have lost hundreds of thousands of dollars as a result of the Commission's alleged wrongdoing.

**20.** Defendants' brief in support of its Motion to Dismiss p. 12.

**21.** 15 U.S.C. § 2056.

**22.** A short answer to these arguments would be that there was also a Section 7 proceeding pending at the time of the *GTE* case. 40 Fed. Reg. 8592. These arguments were apparently not addressed to the Court in that case, however, and accordingly, I do not consider *GTE* to be controlling on this point.

seeks to restrain the exercise of the information function respecting aluminum branch wiring on the grounds that the Commission lacks jurisdiction over this product and that, in any event, it is exercising this function in violation of Kaiser's rights under Section 6(b)(1) of the Act. While a determination of these claims might have some precedential value in the context of the Commission's Section 7 proceeding, Kaiser is not attempting in this action to abort that proceeding.[23]

■ In this context, and with the Commission's concession that Kaiser could have secured judicial review of the Commission's exercise of its information dissemination function in the absence of the Section 7 proceeding, it is difficult to understand the Commission's argument that there is not final agency action currently available to be reviewed. The facts are (1) the Commission has allegedly disseminated information to the public in violation of Kaiser's rights and allegedly will continue to do so, in the future, and (2) Kaiser alleges serious, immediate and continuing injury to its business from this dissemination. In these circumstances, there has been final agency action.[24]

### 2. Exhaustion of Remedies.

■ The Commission concedes that there is no specially established Commission procedure for reviewing claims that a manufacturer's rights under Section 6(b)(1) have been violated.[25] It argues, however, that the pending proceedings provides Kaiser with a remedy it can, and must, exhaust, prior to coming to the courts. Section 9(c) of the Act,[26] the Commission notes, provides that: (1) prior to promulgating a consumer product safety rule, the Commission shall consider, and shall make appropriate findings for inclusion in such rule with respect to—

(A) the degree and nature of the risk of injury the rule is designed to eliminate or reduce;

(B) the approximate number of consumer products, or types or classes thereof, subject to such rule . . . .

The Commission asserts that Kaiser will be able to raise its claims about the Commission's jurisdiction in the course of arguing

---

**23.** Kaiser seeks no injunctive relief against the Section 7 proceeding. It does, however, maintain that the Notice of this proceeding violated Section 6(b)(1) and one interpretation of the relief that it does seek would entail a restraint on similar Commission publications in connection with the Section 7 proceeding. I conclude, however, that Section 6(b)(1), with the exception of the last sentence dealing with retractions of previously published information found to be false, does not apply to the publication of material for the purposes of an administrative proceeding like the one currently pending under Section 7. Section 6(b)(2), 15 U.S.C. § 2055(b)(2).

**24.** See, for example, *Utah Fuel Co. v. Coal Commission*, 306 U.S. 56, 59 S.Ct. 409, 83 L.Ed. 483 (1939) (district court's equity jurisdiction extended to bill for injunction to prevent Commission's release of allegedly confidential information, even though administrative hearing in which the information was proposed to be used was pending); *Silver King Mines v. Cohen*, 261 F.Supp. 666 (D.Utah 1966) (district court suit to enjoin SEC's unwarranted releases of damaging information was proper despite pendency of SEC proceedings to which releases pertained); *cf. Abbott Laboratories v. Gardner*, 387 U.S. 136, 149–152, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) ("finality" requirement to be pragmatically interpreted); *Lam Man Chi v. Bouchard*, 314 F.2d 664, 670 (3rd Cir. 1963) (whether agency action is "final" depends upon "realistic appraisal of the consequences of such action"); *Columbia Broadcasting Systems v. United States*, 316 U.S. 407, 418–19, 62 S.Ct. 1194, 1201, 86 L.Ed. 1563 (1942) (FCC regulation which amounted to only a "statement of intentions" held reviewable where it caused "injury cognizable by a court of equity"); *Aquavella v. Richardson*, 437 F.2d 397 (2nd Cir. 1971) (a withholding of needed funds pending administrative audit held final agency action); *Isbrandtsen Company v. United States*, 93 U.S. App.D.C. 293, 211 F.2d 51 (1954), *cert. denied*, 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954) (temporary order of federal maritime board having serious economic consequences to steamship line held immediately reviewable).

**25.** Transcript of Oral Argument on Cross-Motions (March 5, 1976) ["T"], at 51. It also concedes, as it must, that Kaiser's letter application did not result in a Commission determination of Kaiser's claims.

**26.** 15 U.S.C. § 2058(c).

the Section 9(c)(1)(B) issue and its claims about the fairness and accuracy of the Commission's releases in the course of arguing the Section 9(c)(1)(A) issue. Given the availability of this remedy, the Commission argues, the Court should stay its hand and give the CPSC "an opportunity to make a record, apply [its] expertise, and [if necessary] . . . correct [its] own errors. . . ." [27]

Before the exhaustion of any administrative remedy will be required, however, that remedy must be shown to be "adequate". An adequate remedy, the Supreme Court has stated, is one which promptly and certainly affords the litigant an opportunity to obtain the relief sought.[28] In the present case the proffered remedy does not measure up to the applicable standard.

With regard to promptness, the statutory scheme under which the Commission operates requires, with exceptions not here relevant,[29] that the development of a consumer product safety standard shall precede the publication and promulgation of a consumer product safety *rule* with respect to the consumer product in question.[30] Kaiser has asserted without contradiction that the Commission's own experts have estimated that the development of a safety standard with respect to aluminum wiring and/or wiring systems will likely take until sometime in mid-1978.[31] Given Kaiser's allegations that the Commission's public releases have caused and will continue to cause severe damage to its aluminum wire business (including its sales, good will and certain of its business relationships), a wait of this duration seems unduly harsh. *Cf. Smith v. Illinois Bell Tel. Co.*, 270 U.S. 587, 591, 46 S.Ct. 408, 70 L.Ed. 747 (1926) (two-year delay by administrative agency in acting on plaintiff's proposed rate schedule precluded agency's reliance on exhaustion of remedies doctrine where plaintiff claimed existing rates were confiscatory); *Sunshine Publishing Co. v. Summerfield*, 184 F.Supp. 767, 769 (D.D.C.1960) (15 month delay in acting on plaintiff's mailing permit precluded post office from relying on exhaustion of remedies doctrine).

With regard to certainty, the Supreme Court has made it clear that an administrative remedy which bars early resort to judicial remedies must be something more than speculation.[32] Here, there is no reason to expect that the Commission will or should concern itself in the rule-making proceeding with the issues of whether Kaiser is entitled to pre-publication notice of releases like those of July and September, 1975 and whether the Commission has taken or will take, reasonable steps prior to such releases to assure that the information is "accurate" and "fair in the circumstances". Nor is there any assurance that, in the rule-making proceeding, the Commission will address itself to the issue of whether there should be a retraction of the specific information supplied in the Commission's public releases.[33]

It is true that at some point in the rule-making proceeding, the Commission is likely to address itself to whether it has jurisdiction to promulgate a rule regarding aluminum branch wiring and I know of no reason why that legal issue would be different when posed in that context than when posed in the context of the Commission's authority to disseminate information about consumer product hazards. I am per-

---

**27.** Defendants' Reply Memorandum, Doc. No. 32, at 3, *citing, Parisi v. Davidson*, 405 U.S. 34, 37, 92 S.Ct. 815, 31 L.Ed.2d 17 (1971).

**28.** *Parisi v. Davidson, supra*, 405 U.S. 41–2, 92 S.Ct. 815.

**29.** 15 U.S.C. § 2057.

**30.** 15 U.S.C. § 2058(a)(1).

**31.** Plaintiff's Reply Memorandum, Doc. No. 19, at 29 n. 18.

**32.** *Parisi v. Davidson, supra*; *cf. Township of Hillsborough v. Cromwell*, 326 U.S. 620, 625, 66 S.Ct. 53, 90 L.Ed. 415 (1946).

**33.** There is even no assurance that there ever will be a rule-making proceeding since Section 7(f) of the CPSA gives the Commission the power to discontinue proceedings at the safety standard development stage. 15 U.S.C. § 2056(f).

suaded, however, that the rule-making proceeding does not bar this Court from entertaining Kaiser's claim concerning the Commission's jurisdiction.

The exhaustion of remedies doctrine is not a jurisdictional matter,[34] but "is applied in a number of different situations and is, like most judicial doctrines, subject to numerous exceptions, [its application to specific cases requiring] an understanding of its purposes and of the particular administrative scheme involved."[35] A leading author in the administrative law field has, in fact, suggested that, where the attack on administrative action is based on an asserted lack of jurisdiction, three factors are to be weighed in determining whether the exhaustion requirement is to be imposed: extent of injury from pursuit of the administrative remedy, degree of clarity or doubt about the administrative jurisdiction, and involvement of specialized administrative understanding in the question of jurisdiction.[36]

I agree with the Commission that the question of its jurisdiction over aluminum branch wiring is one about which reasonable minds could differ. On the other hand, I am not convinced that the CPSC possesses any special expertise in construing the "consumer product" language of its enabling statute, as distinguished from its expertise in evaluating the safety of, or the degree of risk associated with, the various consumer products themselves. Furthermore, the question is one of law to be determined, not on the basis of a fact record to be developed by the Commission, but on the basis of the statute and its legislative history. Lastly, Kaiser, as already noted, has alleged that its aluminum

wiring business is being and, during the course of the Commission proceedings, will be substantially and unfairly undermined by the Commission's releases. Under these circumstances, exhaustion of whatever opportunities there may turn out to be in the rule-making proceeding should not be required.

### 3. Preclusion Of Review.

■ Finally, the Commission argues that the Congressional designation of courts of appeals [37] as the appropriate judicial bodies to review Commission-promulgated rules forecloses review in this Court, at least at this time.[38] It relies, in particular, on *Getty Oil (Eastern Operations), Inc. v. Ruckelshaus*, 467 F.2d 349 (3rd Cir. 1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973). I find this argument unpersuasive.

In *A. O. Smith Corporation v. F. T. C.*, 530 F.2d 515 (1976), the Third Circuit had occasion to comment on the scope of *Getty Oil*. That case applied, said the Third Circuit, to situations where "[the relevant statute] demonstrated *a clear congressional intent* to limit judicial review . . . to the court of appeals".[39] In the present case, no such Congressional intent appears.

15 U.S.C. § 2060, the part of the CPSA dealing with review by the courts of appeals, states in relevant part:

(a) No later than 60 days after a consumer product safety rule is promulgated by the Commission, any person adversely affected by *such rule,* or any consumer or consumer organization, may file a petition . . . for judicial review *of such rule.* . . . The Commission shall

---

**34.** *Ecology Center, Inc. v. Coleman*, 515 F.2d 860, 865–66 (5th Cir. 1975).

**35.** *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969) (footnote omitted).

**36.** 3 *Davis, Administrative Law Treatise* 69 (1958).

**37.** 15 U.S.C. § 2060 provides that review of CPSC rules may be had in the "United States court of appeals for the District of Columbia or

for the circuit in which [an aggrieved], [a consumer] or [consumer organization], resides or has his principal place of business . . . ."

**38.** Defendants do concede that, if the pending rule-making proceeding were to abort, review could be had in this Court. Memorandum in Support of Motion to Dismiss, Doc.No.16, at 23.

**39.** *Id.,* at 14–15 (emphasis supplied).

transmit to the Attorney General, who shall file in the court, the record of the proceedings on which the Commission based its rule . . . . For purposes of this section, the term "record" means *such consumer product safety rule . .* any written submission of interested parties; and any other information which the Commission considers relevant *to such rule.*

\* \* \* \* \* \*

(c) Upon the filing of the petition . . . the court shall have jurisdiction to review *the consumer product safety rule . . .* and to grant appropriate relief. . . . . The *consumer product safety rule* shall not be affirmed unless the Commission's findings . . . are supported by substantial evidence on the record taken as a whole.

(d) The judgment of the court affirming or setting aside, in whole or in part, *any consumer product safety rule* shall be final . . . . .

The most natural reading of this statute would be one limiting the scope of review to the Commission's promulgation of a rule. Such a reading would not, of course, cover Kaiser's claims about unfair publicity. In any event, there is no evidence in the statute that the court of appeals' review was meant to be exclusive. In fact, the concluding paragraph of the section states: "the remedies provided for in this section shall be in addition to but not in lieu of any other remedies provided by law." Accordingly, defendants' third argument is without merit and the Court has jurisdiction to hear this case.[40]

### B. *Failure To State A Claim.*

As a second ground for its motion to dismiss, the Commission argues that Kaiser is not entitled to relief under Section 6(b)(1) (15 U.S.C. § 2055(b)(1)) because its identity is not "readily ascertainable" from the Commission's releases. Conceding that a manufacturer need not be expressly named in a public release of information to be entitled to the protections of Section 6(b)(1), the Commission nevertheless argues that where, as here, the publications are directed at a whole "category of products" and do not single out any particular manufacturer of the product, Section 6(b)(1) does not apply. Kaiser responds, however, that since it is one of the only four manufacturers of aluminum branch wiring and since contractors who purchase these products associate the Kaiser name with it, Kaiser's identity is "readily ascertainable" from the releases.

■ Section 6(b)(1), quoted earlier, evidences a Congressional realization that the Commission's informational activities might cause substantial injury to manufacturers of consumer products. The section thus mandates that if the Commission finds it has publicly disclosed inaccurate or misleading information which reflects adversely upon the safety of a consumer product or the practices of any manufacturer, a retraction shall be made. This is a blanket provision applicable to all public disclosures by the Commission in any context, and without regard to whether the public information identifies a particular manufacturer.

The other provisions of Section 6(b)(1) are more circumscribed than the retraction provision, however. The prior notice provision, for example, requires the Commission to notify "each manufacturer . . . of any consumer product to which such information pertains" but *only* "if the manner in which such consumer product is to be designated or described . . . will permit the public to ascertain readily the identity of such manufacturer." Similarly, the mandate of the Act concerning "reasonable

---

**40.** Defendants' ancillary reliance on *Weinberger v. Hynson, Wescott & Dunning,* 412 U.S. 609, 627, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1972) and *Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 649, 652, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1972) is misplaced. These cases merely hold that, under the scheme of the amended Food, Drug and Cosmetic Act, the FDA has the authority to make certain determinations regarding its jurisdiction without the need for a court proceeding. In the present case the Commission's authority to make an initial determination regarding its jurisdiction and to proceed accordingly has not been questioned.

steps [to assure accuracy and fairness] . . . prior to public disclosure" refers expressly only to "information from which the identity of such manufacturer or private labeler may be readily ascertained."

■■ The possibility of injury to manufacturers from information pertaining solely to a generic product, without direct or indirect reference to any particular manufacturer or manufacturers of the product, was apparent to Congress. The retraction provision which it adopted was designed to cover this situation. Congress also apparently realized that there would be practical limits on the Commission's ability to give advance notice, and an opportunity to comment, to all manufacturers who might conceivably be injured by a Commission publication. In striking the balance, it seems to this Court that Congress restricted the Commission's pre-notification obligations to situations where a manufacturer is expressly identified or where the release identifies a distinctive feature of a product not common to other manufacturers in the same product line and thereby indirectly informs the public of the identity of a particular manufacturer or manufacturers.[41]

Given this construction, it follows that Kaiser is not entitled to pre-publication notice of releases such as those currently under attack here. It does not follow, however, that the Commission's motion to dismiss should be granted.

First, the Commission's success with respect to the "readily ascertainable" standard does not provide an answer to Kaiser's argument regarding lack of Commission jurisdiction. Nor does it provide a satisfactory response to Kaiser's claim of entitlement to a retraction. It is true that the duty of retraction provision refers to situations where "the Commission finds" it has

erred and, if the Commission had an established procedure by which affected manufacturers had the opportunity to try to persuade the Commission that a particular release was inaccurate, I would be reluctant to hold that there could be a judicial review of such a charge without prior resort to that remedy. Absent any such administrative procedure, however, the protection which Congress intended the manufacturers and the public to have would be seriously jeopardized if retraction had to await the fortuitous occasion when the Commission happened to come back to the subject matter of its erroneous release and see the light.

Finally, while the language of the "reasonable steps" provision is limited to information identifying a particular manufacturer, the Commission concedes, as I understand it, that it is subject to the overriding requirement of the Administrative Procedure Act ("APA") that it avoid agency action which is "arbitrary, capricious [or] an abuse of discretion."[42] Given the allegations of Kaiser's complaint, I am unwilling to find that it cannot possibly establish a claim of this kind. *Conley v. Gibson*, 355 U.S. 41, 45–6, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

The Commission's motion to dismiss will, accordingly, be denied.

## II. KAISER'S MOTION FOR A PRELIMINARY INJUNCTION.

In the *GTE* case, this Court summarized the considerations to be weighed in deciding whether *pendente lite* injunctive relief is appropriate:

Before preliminary injunctive relief may be granted, plaintiffs must show (1) a reasonable probability of eventual success on the merits and (2) that they will

---

41. The protection extended thus appears to be protection from unfair disclosure which injures a particular manufacturer in his ability to compete with other manufacturers of the same consumer product. Kaiser has made an appealing argument that this rationale should entitle it to pre-publication notice because the product here is aluminum branch circuit wiring in general and its capacity to compete with copper branch

circuit wiring is being jeopardized. I conclude, however, that application of this rationale to the notification provisions of Section 6(b)(1) would prescribe an administratively unfeasible standard.

42. 5 U.S.C. § 706(2)(A); *GTE Sylvania, Inc. v. Consumer Product Safety Commission*, 404 F.Supp. 352, 367 (D.Del.1975).

suffer irreparable harm *pendente lite* if relief is not granted, and furthermore, the Court must consider (3) the impact of its decision on other interested persons and (4) the public interest. *Oburn v. Shapp*, 521 F.2d 142, 147 (C.A.3, 1975); *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (C.A.3, 1974); *A. O. Smith Corp. v. FTC*, 396 F.Supp. 1108, 1117–20 (D.Del.1975) (appeal pending); *Bowers v. Columbia General Corp.*, 336 F.Supp. 609, 613 (D.Del.1971).

404 F.Supp. at 369.

### A. The Probability of Kaiser's Ultimate Success on the Merits.

#### 1. Kaiser's Jurisdictional Attack.

■ The CPSA defines "consumer product" as follows:

[A]ny article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise . . . .[43]

Since aluminum wire intended for use in branch circuits is not sold directly to consumers as such, the parties agree that any jurisdiction of the Commission over this product would necessarily involve a conclusion that it is an "article . . . produced or distributed . . . for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence. . . ." Kaiser maintains that aluminum branch wiring is a part of the house itself and thus cannot be something used "in or around" a house.

While the Commission "does not contend that it has authority to regulate housing,"[44]

it does assert that aluminum branch wiring is a consumer product over which it has jurisdiction. It does not torture the statutory definition, the Commission suggests, to think of a consumer "using" the wiring "in his house" (as, for example, when he turns on some electrically-powered device).

Although, on a purely linguistic basis, I find Kaiser's interpretation more persuasive, I believe the statutory language sufficiently ambiguous to justify resort to extrinsic interpretative aids. *Cf.*, e. g., *United Shoe Workers v. Bedell*, 165 U.S. App.D.C. 113, 506 F.2d 174, 179 (1974). The available extrinsic evidence provides substantial support for Kaiser's assertions that the Commission has not been granted jurisdiction over aluminum branch circuit wiring.

From the outset, both the House and the Senate versions of the CPSA contemplated that Commission-approved standards for "consumer products" would preempt the field. With one exception, a state or local government could have a generally applicable standard relating to the same consumer product hazard only if it were "identical" to the federal standard.[45] In the finally adopted House version, the one exception involves situations where the Commission, by rule, issued after notice and hearing, exempts a specific proposed local standard from the preemption provisions of the Act—this after finding that the local standard (1) imposes a higher level of performance than the federal standard, (2) is required by compelling local conditions, and (3) will not unduly burden interstate commerce.[46]

■ At the same time, Congress, in considering the CPSA, seems to have contemplated that the Act would not, at least as a general proposition, preempt state and local building codes. The primary concern of Congress, in fact, appears to have been the

---

**43.** 15 U.S.C. § 2052(a)(1). The definition of "consumer product" recites nine exceptions, none of which is here relevant.

**44.** T. 44.

**45.** For the final version of the preemption section, see 15 U.S.C. § 2075.

**46.** 15 U.S.C. § 2075(c).

filling of *gaps* in existing national/state regulation, rather than the supplanting of local regulation of housing design and construction. This fact is highlighted in the debate concerning the treatment to be accorded mobile homes under the CPSA. Senator Eagleton, for example, proposed an amendment to the Act which would have expanded the definition of a "consumer product" to expressly include mobile homes. In pleading for passage of the amendment, Senator Eagleton emphasized that "mobile homes are now regulated neither as 'vehicles' under the Motor Vehicle Safety Act, nor as housing under local housing codes of most communities. . . ." 118 Cong. Rec. 21898, 21900 (June 21, 1972). Senator Taft, a co-sponsor of a separate bill to set national safety standards for mobile homes under the aegis of HUD, agreed with the wisdom of *some* federal regulation of mobile homes in the following terms:

> The need for establishing federal safety standards for mobile homes cannot be overemphasized. Unlike conventional housing, mobile homes are not subject to local housing ordinances. . . ."

*Id.* at 21900.

Finally, Senator Brock, the other co-sponsor of the HUD bill, stated:

> If [the Eagleton] amendment were adopted, mobile homes would be the only form of housing contained in this legislation, although presently modular homes also are not regulated by local building codes in most parts of the country. . .

Id. at 21899.[47]

The same theme occurs in other portions of the CPSA legislative history. The original Senate version of the Act, for example, contained the following provision:

> Whenever the Commissioner finds, on the basis of information available to him, that exposure to *an aspect of the household environment other than a consumer product* presents an unreasonable risk of personal injury or death and that *a recognized building, electrical, or other code covers that aspect of the household envi-*

> *ronment, he may recommend to the appropriate code-making authority*, and to those authorities responsible for enforcing the code *having jurisdiction over that aspect, the code changes he considers warranted* to reduce the risk to a reasonable level. (Emphasis added)

On September 27, 1972, Senator Magnuson reminded the Senate of the relationship between this provision and the then proposed Housing Act of 1972 which, among other things, created a National Institute of Building Sciences:

> It is intended that the Commissioner, in exercising this authority to make recommendations to code authorities, would consult with the National Institute of Building Sciences, when, and if, it is established.

> The close consultation intended should provide for a coordinated Federal approach to housing-related codes at the State and local level. This consultation will also be valuable to the Commissioner of Product Safety by making available *a more specialized expertise in construction technology than is likely to characterize the Food, Drug, and Consumer Product Agency which will have its expertise in other areas.* 118 Cong.Rec. 32496–97. (Emphasis added)

The above-quoted provision of the Senate version was contained in the section of the statute relating to the collection and dissemination by the Commission of product hazard information. The House version of this Section, which did not contain a similar provision, was ultimately adopted by the Conference Committee but the circumstances of this decision do not suggest that the Committee had a differing view about the effect of the Act on existing building codes. To the contrary, subsequent action of the Congress confirms that federal preemption of "consumer product" safety was not intended to intrude upon matters traditionally addressed in building codes.

Public Law 93–383, known as the Housing and Community Development Act of 1974, contained both the Mobile Home Act

---

47. The Eagleton amendment was defeated by a vote of 63 to 16.

and provisions establishing a National Institute of Building Sciences. While federal regulation (albeit outside the CPSC) was considered appropriate in the case of mobile homes, which remain moving over the highways and in commerce long after their sale to a consumer, Congress acted quite differently with regard to housing design and construction. The function of the National Institute of Building Sciences is essentially to develop "nationally recognized performance criteria" for building homes, to coordinate its research and development activities with other public and private agencies, and finally, to *encourage* local authorities to adopt developed standards. 12 U.S.C. § 1701j–2(e). Preemption of local regulation has no role in the federal statute. Indeed, the statute is very explicit in restricting the Institute's authority to impose its standards upon local governments:

> The Institute in exercising its functions and responsibilities . . . shall (A) give particular attention to the development of methods for encouraging all sectors of the economy to cooperate with the Institute and to accept and use its techni-.cal findings, and to accept and use the nationally recognized performance criteria, standards, and other technical provisions developed for use in Federal, State, and local building codes and other regulations which result from the program of the Institute . . .. (12 U.S.C. § 1701j–2(e)(3))

This advisory and hortatory role stands in sharp contrast with the preemptive federal regulation effected by the Consumer Product Safety Act and the Mobile Home Act.

Kaiser points out that the composition and method of installation of branch circuit wiring is almost universally regulated by state and local building codes relating to the design and construction of residential dwellings. The Commission does not contend otherwise. Rather, it places its primary reliance on an October 18, 1973 letter to the Chairman of the Commission from two Senators and one Congressman who played key roles in the passage of the CPSA. This letter expresses the opinion that "aluminum wire" is within the scope of the Commission's jurisdiction. I, of course, accept this letter as reflecting the considered and informed opinion of its authors. The views of individual legislators as reflected in legislative history is of relevance in statutory interpretation, however, because it reveals the context in which the legislature has made its corporate decision. Given this rationale, subsequently-authorized opinions of individual legislators should not be accorded the same weight as interpretations reflected in the record before the legislature at the time of its deliberations.[48]

■■■ Based upon the wording of the Congressional definition of a consumer product and the legislative history to which I have thus far been referred, I conclude that Kaiser has a reasonable probability of success on its claim that the Commission lacks jurisdiction over aluminum branch circuit wiring.

### 2. *Kaiser's Attack On The Content Of The Commission's Releases.*

Kaiser's attack on the Commission's releases regarding aluminum branch wiring is summarized in its Reply Brief as follows:

> As Plaintiff demonstrated in its initial Memorandum, the Commission has released information in a manner which has led the public to believe that it has collected meaningful statistical evidence of a significant hazard associated with aluminum wiring. It has also misled the public into believing that final determinations about the safety of aluminum wiring have been made. When these disclosures were made, the Commission was fully aware that its alleged incident reports were studded with inaccuracies, that they were almost completely unverified, and that even if they were correct they were statistically meaningless in light of the overall number of home wir-

---

48. In *Epstein v. Resor,* 296 F.Supp. 214 (N.D. Cal.1969), an affidavit of Congressman Moss specifying his intent as a co-author of the Administrative Procedure Act was rejected for just such reasons. 296 F.Supp. at 216.

ing fires occurring each year. It was also aware that no final determination about the degree of risk (if any) posed by aluminum wiring systems had been made.

It would unduly lengthen this Opinion to set forth all of the facts relied upon by Kaiser in support of these contentions. Three examples will suffice to convey the gist of Kaiser's charges.

A Commission survey has indicated that during one twelve-month period, there were approximately 167,000 household fires traceable to electrical wiring. Most homes are wired with copper. The 500 "incidents" repeatedly cited by the Commission occurred over an eight year period so that the average per year would be approximately 65. In this context, Kaiser maintains, 65 "incidents" (not all of them fires) involving aluminum wiring have "no significance whatever". Kaiser's conclusion in this respect is similar to that of the National Bureau of Standards:

> . . . The existing field data are of neither sufficient quality nor sufficient quantity to make statistically defensible estimations of the nature and extent of aluminum wire use or of the level of risk to consumers of such use.[49]

Second, the Commission's references to 179 "Hotline" reports of hazardous condi-

tions is said to be misleading because the Commission failed to note, in each instance, that the calls were prompted by an article in a newspaper which contained the following passage:

> If the Commission ever decides to order some member of the industry to pay for corrective action, your report will have let the Commission know about your house.[50]

Third, Kaiser asserts that the Commission's slipshod approach to its task is demonstrated by its inclusion in the 500 "incidents" figure of 109 incidents reported, directly or indirectly, by local fire officials. Kaiser notes that the Commission's own analysts have called into question the objectivity[51] of this group and the qualifications[52] of its members where electrical fires are concerned. Kaiser cites the Commission's experience with the fire marshals from Fountain Valley, California, as one specific example of the unreliability of data from this source. These two men had stated to the Commission that aluminum wiring had been involved in all 26 incidents they had reported. When Commission investigators attempted to verify the information, however, they could find no record at all of some of the reported incidents; of those records which were found, five made

---

49. "Hazard Assessment of Aluminum Electrical Wire in Residential Use", National Bureau of Standards (December, 1974) [hereafter "Hazard Assessment"] at 39.

50. "Hazard Analysis/Aluminum Wiring", U. S. Consumer Product Safety Commission (Bureau of Epidemiology) (April, 1975), [hereafter "Hazard Analysis"] at 10.

51. Concerning the general reliability of local fire officials, the Technical Analysis Division of the National Bureau of Standards stated:

> On the part of inspectors and others, perceptions of individual cases and recollection of groups of cases are necessarily preconditioned by opinions based on their own prior experiences and on reports of others. Thus, once an inspector has formed the opinion that aluminum wiring is a fire hazard, the mere presence of aluminum wiring at the scene of a fire may induce him to attribute the fire to that wiring. Furthermore, when asked to estimate numbers of fires caused by aluminum wiring he may overestimate the

number and/or include all the incidents that he perceives to have potential fire conditions.
Aff. of J. J. Cashel in support of plaintiff's motion, Doc. No. 6, Exh. B at 23.

52. Concerning fire investigations, the Technical Analysis Division of the National Bureau of Standards had the following to say:

> . . . [M]ost fire departments do not have fire investigators who are also trained or experienced in electrical matters. . . . Many fire departments have no trained investigators specifically for electrical fires. Thus, it is commonly accepted that some of the fires identified as electrical did involve some piece of electrical equipment, but not necessarily as a cause. Second, it is reported by these sources that fires of unknown origin are sometimes called electrical and that investigation reports are sometimes written without an on-the-scene investigation having actually taken place. . . .

Aff. of J. J. Cashel, Doc. No. 6, Exh. B at 22.

no mention at all of aluminum wiring. The Commission's approach was to simply remove these five incidents from the total and to accept the balance *in toto.*

In accordance with its view of the law, Kaiser has pressed this critique of the Commission's releases in support of its argument that the Commission has violated Section 6(b)(1). As earlier indicated, however, it is the Court's view that any *pendente lite* relief premised on the Commission's public releases would require a finding that the Commission, in making those releases, has acted arbitrarily, capriciously, or in abuse of its discretion. The parties have not briefed this issue, however, and I am not convinced that it is the same issue which would be posed of Section 6(b)(1) were applicable.[53] This fact, together with the conclusion hereafter reached regarding Kaiser's claim to irreparable injury, leads me to the conclusion that the Court should not now pass on Kaiser's likelihood of success on the merits in this area.

### B. *Irreparable Injury.*

Kaiser has shown that its aluminum branch wiring sales have significantly declined during the period of the challenged Commission activities. The Commission's suggestion that this is attributable to a decline in housing starts during this period is undoubtedly true in part, but I consider it more probable than not that Kaiser has suffered substantial loss as a result of the Commission's actions in the aluminum branch wiring area.

■ The sole purpose of a preliminary injunction, however, is to prevent irreparable injury during the period from its entry until the final disposition of the case. Moreover, the future irreparable injury to be prevented must be injury which the plaintiff will suffer as a result of conduct likely to be held illegal. Kaiser's past injury from the Commission's press releases is, accordingly, relevant only to the extent it suggests that there will be future injury from that or a similar source. Moreover, in the context of this case, the Court believes it must be careful to distinguish injury likely to arise from the exercise of the Commission's information function and injury likely to arise from the Commission's legislative activities.

■ On November 4, 1975, the Commission found and announced to the public that it had preliminarily determined "that aluminum wire systems as defined   .   .   . [in the Notice of the Section 7 proceeding] present an unreasonable risk of injury." Kaiser's affidavits from some thirteen experienced electrical contractors suggest that it is this finding and the resulting proceedings which are at the root of Kaiser's present problems [54] and I am not convinced that Kaiser will suffer any irreparable injury as a result of the Commission's past or future public releases which it would not in any event suffer as a result of the Commission's standard development proceedings.

Put another way, I am unpersuaded that any preliminary injunctive relief, at least any relief short of an order vacating the notice and aborting the standard development proceeding, would prevent the future irreparable injury which Kaiser fears, and Kaiser perhaps, recognizing the implications of an order aborting the Commission's proceedings, has not asked for relief of that stripe. While Kaiser is, of course, not fore-

---

53. I doubt, for example, whether the cited APA provision would warrant a court in subjecting Commission releases to the same scrutiny as a prospectus in a securities case. Arguably, however, the Commission should be required to show some basis in fact for suggesting that a hazard may exist. Wholly apart from the reliability of the reports of "incidents" and their statistical significance, the Commission's "Fact Sheet" suggests that it believes the physical properties of aluminum wire provide a basis in fact for suggesting that a hazard may exist.

While Kaiser disputes the Commission's theory, the present record does not provide a satisfactory basis for evaluating the Commission's contention.

54. The one local ordinance in the record which bans the use of aluminum wiring and makes reference to the CPSC adverts to the CPSC's "determinations of unreasonable risk" and not to the Commission releases *per se.* Aff. of J. J. Cashel in Support of Motion, Doc. No. 7, Exh. "R".

closed from hereafter requesting such relief, I think it apparent that the propriety of that relief would involve a balancing of interests far different from anything that has thus far been argued to the Court. While the Court has made a preliminary determination that the Commission lacks jurisdiction in the area of aluminum branch wiring, that determination is preliminary only. Any application to enjoin the Commission's proceedings would, among other things, necessarily entail consideration of the public interest in avoiding a possibly unjustified delay in the administrative formulation of a safety standard which is perhaps needed.

In short, Kaiser has not demonstrated that it faces irreparable injury which the Court can avoid by granting the *pendente lite* relief it seeks. For this reason, its motion for a preliminary injunction will be denied.