**KAISER ALUMINUM AND CHEMICAL CORPORATION, a corporation,
Plaintiff,**

v.

**The UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION et al., Defendants.**

**Civ. A. No. 76–44.**

United States District Court,
D. Delaware.

March 11, 1977.

Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington, Del., Arnold M. Lerman and Ronald J. Greene, of Wilmer, Cutler & Pickering, Washington, D. C., Max Thelen, Jr., Fredric C. Nelson and Kennedy P. Richardson, of Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., Robert W. Turner and Dennis M. Day, of Kaiser Aluminum & Chemical Corp., Oakland, Cal., for plaintiff.

John H. McDonald, Interim U. S. Atty., Wilmington, Del., Thomas S. Brett and Edward B. Craig, IV, U. S. Dept. of Justice, Washington, D. C., Michael A. Brown and David Schmeltzer, U. S. Consumer Product Safety Commission, Washington, D. C., for defendants.

STAPLETON, District Judge:

This is an action brought by Kaiser Aluminum and Chemical Corporation challenging on several grounds [1] actions of the Consumer Product Safety Commission (hereinafter "CPSC" or "the Commission") with respect to aluminum branch circuit wiring. Kaiser sought both preliminary and permanent injunctive relief. The Commission moved to dismiss the complaint. In an earlier Opinion I denied both the motion to dismiss and the request for a preliminary injunction. Thereafter, the parties agreed to, and the Court approved, a stipulation severing for early trial the question of whether, by the actions complained of, the Commission exceeded its jurisdiction under the Consumer Product Safety Act, 15 U.S.C. § 2051, et seq. (hereinafter "CPSA" or "the Act"). The parties agreed to a trial of this question on affidavits and depositions. The written record is before the Court and the matter has been briefed and argued. It is now ripe for disposition.

In my earlier Opinion I denied the preliminary injunction because I found that Kaiser had not shown the requisite likelihood of irreparable injury. However, I concluded on the basis of the record then before me that it was more likely than not that Kaiser would succeed on its argument that the Commission does not have the jurisdiction which it claims. The Commission has not presented any factual data or legal arguments that sway me from that initial determination.

## I. THE STATUTE.

The statute defines a consumer product as any article which is "produced or distributed"

---

1. These are fully described in the Court's first Opinion in this case. 414 F.Supp. 1047 (D.Del. 1976).

(i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation or otherwise; or

(ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation or otherwise; [2]

The Act explicitly excludes from its coverage

any article which is not *customarily* produced or distributed for sale to, or use by, or enjoyment of, a consumer.[3]

## II. THE STATUTORY EXCLUSION.

The purpose of this exclusion is to exempt from the Act those products which may occasionally be sold to a consumer but which are, in fact, industrial products—that is, products which are not produced or distributed with the intention that they will be sold to or used by consumers in substantial quantities.[4] The exclusion does not cover all products the majority of the sales of which are to commercial or industrial users. All that is required to give the Commission jurisdiction, I conclude, is that an article which a consumer uses in or around a household be regularly available to consumers through channels to which they have reasonable access and that there be substantial incidence of consumer sales.

The evidence in this case shows that branch circuit wiring is available for sale to consumers through ordinary consumer channels. Before reviewing that evidence, I note that I have not considered aluminum branch circuit wiring as a product distinct from other branch circuit conductors. Kaiser has proffered no persuasive rationale for distinguishing aluminum from other branch circuit conductors. The hazards associated with each may differ but functionally the products are the same. Thus, if analysis were to show that, generically, branch circuit wiring is a consumer product, I would conclude that the CPSC could regulate aluminum branch circuit wiring for whatever hazards might be unique to it.[5]

The sales data submitted by the parties took a variety of forms. Results of a field survey, a mail survey, and a telephone survey have been filed, along with numerous affidavits from a wide array of individuals who have some tie to the distribution and regulation of branch circuit wiring. Much of the information is marginally useful because it deals solely with sales of aluminum wiring and no other conductor. Nevertheless, there is an ample record to show that a small but significant portion of branch circuit wiring is produced for sale to consumers.

Affidavits of officials of Sears, Roebuck and Company, the nation's largest retailer,

2.  15 U.S.C. § 2052(a)(1).

3.  15 U.S.C. § 2052(a)(1)(A). (Emphasis supplied).

4.  H.R.Rep. No. 1153, 92nd Cong., 2nd Sess. 27 (1972) describes the purpose of the exemption:
    It is not intended that true "industrial products" be included within the ambit of the Product Safety Commission's authority. Thus, your committee has excluded products which are not customarily produced for sale to or use of consumers. The occasional use of industrial products by consumers would not be sufficient to bring the product under the Commission's jurisdiction. The term "customarily" should not be interpreted as intending strict adherence to a quantum test, however. Your committee is aware that some products which were initially sold solely for industrial application have often become broadly used by consumers. If the manufacturer or distributor of an industrial

product fosters or facilitates its sale to or use by consumers, the product may lose its claim for exclusion if a significant number of consumers are thereby exposed to hazards associated with the product.

5.  It does appear that aluminum wiring is less available to consumers than other conductors such as copper. For example, of the 58 retail and wholesale establishments at which government investigators were able to purchase wiring, only 24 carried aluminum wiring. At least two explanations for this appear on the record. First, copper was the substance used traditionally for home wiring. Only when the price of copper rose did the industry begin to turn to aluminum as an alternative. Hazard Analysis—Aluminum Wiring at 1 (April 1975) (Doc. No. 17 Exh. I). Second, since questions about the safety of aluminum wiring have arisen, some merchants have ceased stocking it. *See* Wolff deposition at 30–31. (Doc. No. 80).

and Wickes Lumber, the nation's largest retailer of building supplies, reveal that both companies stock branch circuit wiring for regular sale to consumers.[6] Commission investigators posing as consumer/do-it-yourself homeowners who wished to purchase electrical wiring visited "hundreds" of wholesale and retain outlets of various kinds, e. g., hardware stores, electrical wholesalers, building supply houses. They were able to purchase wiring at 58 establishments in various locations throughout the country. Although many stores did not carry wiring, very few of those who did refused to sell to do-it-yourselfers.[7] Some did require that wire be purchased in lengths of 250 or 500 feet.[8]

In his affidavit, George Ganzenmuller, editor of *Electrical Wholesaling*, reported the results of a survey his magazine conducted in 1975 among electrical wholesalers. It showed that, among those who responded, retailers or the general public accounted for 6.3% of their total sales.[9] The telephone survey conducted among wholesalers and retailers which Kaiser commissioned and which its authors say can be generalized to reflect the complete national sales picture shows that 35% of the retailers of hardware and building supply materials stock house wire.[10]

■ On this record, I feel confident in concluding that branch circuit wiring is produced and distributed in part for sale to consumers. If that were the complete test of what is a consumer product, I would yield to the Commission's judgment that it has jurisdiction over the product. But the statute requires more. The product not only must be produced or distributed for

sale to consumers; it must also be for use by a consumer "in or around a . . . household".

## III.  USE "IN OR AROUND" A HOUSEHOLD.

There can be no honest dispute that the product we are dealing with here is a building supply material intended for incorporation in a branch wiring system of a home. While the Commission's briefing makes much of a proposed distinction between regulating the design and composition of aluminum branch wiring and regulating its use in branch circuit wiring systems,[11] I conclude that this distinction lacks practical substance in the context of a product which is produced and distributed solely for installation in branch wiring systems. This wiring simply cannot be used by a consumer unless and until it is installed as part of the branch wiring system, and the CPSC· has pointed to no hazards associated with aluminum wiring other than as a part of an installed branch wiring system. On the record before me, it would appear that there are none.

The actions of the Commission show that its interest is in aluminum branch wiring systems. The publications of which Kaiser here complains all refer to hazards which the Commission perceives to exist with respect to residential aluminum branch wiring systems. The scope of its concern is also evidenced by the notice commencing the development of a consumer product safety standard.[12] The CPSC there stated that the standard would· be applicable to "household wiring systems involving . . . aluminum wire and various connections.

---

6.  Wolff deposition at 33 (Doc. No. 80); Smith affidavit (Doc. No. 77, Part D).

7.  Affidavits of Brockman, Hill, Knoche, Warchal (Doc. No. 82).

8.  Affidavits of Armbrust, Biggs, Brockman, Bruck, Burchyski, Goins, Hill, Labonski, Lime, Lindenmeier, Phillips, Simpson, Thompson, Vece (Doc. No. 82).

9.  This figure covers *all* sales by the surveyed distributors, not just electrical wiring sales.

10.  Study by Elrick and Lavidge, Inc. (Doc. No. 77, Part B, Exh. A).

11.  The Commission professes to understand that the Act it administers gives it no authority to deal with problems associated with the installation of a product. *See* 15 U.S.C. § 2056(a)(1).

12.  40 Fed.Reg. 51218 (1975).

. . . ." Both the wire and "[a]ll products, devices and assemblies which are used for the purpose of connecting, terminating, bonding, splicing, joining or otherwise maintaining electrical continuity" were named in the list of products to be regulated under the standard that is being developed.[13] But wholly apart from the scope of the Commission's past activities in this area, this Court is mindful that it must give a practical and administratively feasible construction to the regulatory scheme established in the Act. I think it highly unlikely, to say the least, that Congress contemplated a construction of the Act which would require the CPSC to address any problem that may exist with aluminum branch wiring other than in the context of its use by consumers. The notice of the Commission's safety standard proceedings clearly suggests that it shares this view. Accordingly, the crucial question, I believe, is whether Congress intended that branch wiring systems would be within the scope of the responsibility of the CPSC or some other agency. In order to decipher this intent we must look to the statutory definition of a consumer product and to the legislative history.

█ As I observed in my original Opinion, it strains the language employed by Congress to say that something which is a part of a home is for use by a consumer "in or around" a home, and that is a necessary element of the statutory test of a consumer product. As I also pointed out at that earlier stage, the adoption of such a broad reaching construction of this "in and around" the home criterion would produce a result which is inconsistent with what I believe to be the contemplated regulatory scheme as reflected in the congressional deliberations.

An interpretation of the Act which would include electrical branch wiring among con-

sumer products would also include a host of other building materials such as shingles, sheet rock and plumbing fixtures. These, too, are manufactured and distributed for installation in homes and may occasionally be obtained by a do-it-yourselfer for replacement purposes. However, such a broad construction of the statute would seriously undermine what I perceive to be the congressional intent with respect to the division of responsibility between federal and local regulatory bodies in this area.

█ The Commission does not deny that residential use of branch circuit wiring systems is a matter that has traditionally been regulated by local building and housing codes. I reviewed at length in my prior Opinion the legislative debates about whether the CPSA would embrace hazards associated with residential construction.[14] These debates show that Congress decided it should not. Subsequently, Congress passed the Housing and Community Development Act of 1974 and therein created the National Institute of Building Sciences (hereinafter "NIBS" or "the Institute"). In sharp contrast to the broad preemptive powers of the Commission under the CPSA, the Institute was given a strictly advisory role.[15] NIBS is empowered only to make recommendations to state and local regulatory agencies with respect to "performance criteria, standards and other technical provisions for building regulations."[16] If the Commission's reading of its enabling legislation were correct, it would have the authority to preempt state and local building regulations, a result which seems diametrically opposed to the philosophy reflected in the creation of the NIBS.

The Commission nevertheless contends that the legislative history reveals an intent that the term "consumer product" be expansively construed to ensure that the public is protected against unreasonable risks

---

**13.** This approach reflects the Commission's view that the hazard exists, not with insulated segments of aluminum branch wiring, but with segments at connecting and terminal points. *E. g.,* 40 Fed.Reg. 51219 (1975); CPSC Technical Fact Sheet Exh. L.

**14.** 414 F.Supp., at 1059–61.

**15.** *Compare* 15 U.S.C. § 2075 *with* 12 U.S.C. § 1701j–2(e)(1).

**16.** 12 U.S.C. § 1701j–2(g)(4).

of injury. It cites *Kordel v. United States,* 335 U.S. 345, 349, 69 S.Ct. 106, 93 L.Ed. 52 (1948), for the proposition that federal courts should avoid restrictive or technical constructions of public health and safety statutes which create "loopholes" at the expense of public protection. However, the Supreme Court has also cautioned that, in reviewing federal legislation that may pre-empt "an exercise of the 'historic police powers of the States,'" courts should not find that federal legislation has displaced state regulation "'unless that was the clear and manifest purpose of Congress, . . .'"[17]

█ The question here is not whether there is a hazard from which the public should be protected or whether aluminum branch wiring systems should be regulated. Rather, it is a question of how and by whom they should be regulated. Congress has affirmatively expressed its intention that this type of housing regulation remain in the class of police powers reserved to the States and that federal participation be limited to the informational and advisory roles exercised by the National Institute of Building Sciences. There is no room in this scheme for the Consumer Product Safety Commission.[18]

Submit order.

---

17. *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 146, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).

18. In fairness to the Commission it must be noted that the legislative history does provide some support for its view. During floor debates on the bill, Congressman Moss observed:

> Should any member think that the list of hazards compiled by the Commission [i. e., the National Commission on Product Safety] was a final and authoritative list I would recommend that he carefully read the hearings of the subcommittee on this legislation. Very serious questions were raised concerning the safety of many products not investigated by the Commission such as aluminum home wiring.

118 Cong.Rec. 31378 (September 20, 1972). Moreover, a review of the Final Report of the National Commission on Product Safety, which was a resource document before Congress during its consideration of the CPSA, shows that, in fact, it did list "[e]lectrical outlets, built-in wiring devices and distribution systems" among the products theretofore unregulated by other federal consumer legislation. *Id.,* at 90 (June 1970). For the reasons articulated in my prior Opinion, however, I conclude that the legislative history read as a whole is inconsistent with the Commission's position.