**UNITED STATES of America,
Petitioner,**

v.

**The ANACONDA COMPANY et
al., Respondents.**

Misc. No. 77–0024.

United States District Court,
District of Columbia.

June 15, 1977.

Edward B. Craig, IV, U. S. Dept. of Justice, Consumer Affairs Section, Antitrust Div., Washington, D. C., for petitioner.

LeGrande L. Young, Greenwich, Conn., for defendant The Anaconda Co., Wire and Cable Div.

Anthony J. D'Auria, Cole & Dietz, New York City, for defendant Cadillac Cable Corp.

Leonard Sims, U. S. Industries, Inc., New York City, Fred F. Fielding, James S. Wright, Jr., Washington, D. C., for defendant Capital Wire and Cable Corp.

Thomas L. Seifert, Cerro Wire & Cable Co., Marmon Group Inc., Chicago, Ill., Fred F. Fielding, James S. Wright, Jr., Washington, D. C., for defendant Cerro-Marmon Corp.

Howard B. Cloth, Vice-President, Secretary and Counsel, Circle F Industries, Inc., Trenton, N. J., for defendant Circle F Industries, Inc.

J. M. Schwartz, Colonial Wire & Cable Co., New York City, for defendant Colonial Wire & Cable Co.

Milton Levitan, Gainsburg, Gottlieb, Levitan & Cole, New York City, for defendant Columbia Cable & Elec. Corp.

Gilbert S. Edelson, Roseman, Colin, Freund, Lewis & Cohen, New York City, for defendants Eagle Elec. Mfg. Co., Inc. and Slater Elec., Inc.

Gerald Gewirtz, United Technologies Corp., Hartford, Conn., Donald Letizia, Essex Group, Inc., Fort Wayne, Ind., for defendant Essex Group, Inc., A Wholly Owned Subsidiary of United Technologies Corp.

Edward V. Walsh, Jr., White, Walsh & O'Callaghan, Mineola, N. Y., for defendant Ettco Wire and Cable Corp.

Nancy L. Buc, Weil, Gotshal & Manges, New York City, Philip J. Harter, Washington, D. C., for defendant Leviton Mfg. Co., Inc.

Nancy L. Buc, Weil, Gotshal & Manges, New York City, Richard W. Zacks, Winograd, Shine & Zacks, Providence, R. I., Philip J. Harter, Washington, D. C., for defendants American Insulated Wire Co., Inc. and Rhode Island Insulated Wire Co.

William L. Allen, Jr., Hancock, Estabrook, Ryan, Shove & Hust, Syracuse, N. Y., for defendant Pass & Seymour, Inc.

Orin Purintun, Foley & Lardner, Milwaukee, Wis., for defendant Sierra Elec., Division of Sola Basic Industries, Inc.

Van C. Wilks, Southwire Co., Carrollton, Ga., for defendant Southwire Co.

Neale F. Hooley, Hooley, Perselay, Butler & Kelly, Westfield, N. J., for defendant Triangle PWC, Inc., A Wholly Owned Subsidiary of Triangle Industries, Inc.

Ronald J. Greene, Christopher R. Lipsett, Wilmer, Cutler & Pickering, Washington, D. C., Max Thelen, Jr., Fredric C. Nelson, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for Kaiser Aluminum; Robert W. Turner, Dennis M. Day, Kaiser Aluminum & Chemical Corp., Oakland, Cal., of counsel.

Michael D. Hausman, Kohn, Milstein & Cohen, Washington, D. C., for defendant Triangle PWC, Inc.

William N. Letson, Schiff, Hardin & Waite, Washington, D. C., for defendant Coleman Cable and Wire Co., Inc.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This matter arises before the court on petition of the United States for the Consumer Product Safety Commission to enforce certain subpoenas *duces tecum* and *ad testificandum* issued by the Commission on November 24, 1976. The Commission issued the subpoenas pursuant to 15 U.S.C. § 2076(b) to assist its staff in an investigation of whether residential aluminum wiring systems used in 15 and 20 ampere "branch circuit" construction present a substantial product hazard as defined in section 15(a)(2) of the Consumer Product Safety Act, 15 U.S.C. § 2064(a)(2).[1] The present subpoenas were issued after the Commission considered various motions to quash or limit earlier subpoenas directed to the same parties; modifications along the lines suggested by several respondents were incorpo-

rated into the subpoenas at issue.[2] This court has jurisdiction over the enforcement petition. 15 U.S.C. § 2076(c).

Two types of subpoenas have been issued; one set is directed to manufacturers of aluminum wiring and the other set seeks information from manufacturers of electrical devices used in aluminum wiring systems. Both types of subpoenas require information for four broad subject areas: production data, technical data, sales and marketing data, and communications concerning the products. Nineteen companies have failed to comply with the subpoenas and have been made respondents in the present enforcement action. These respondents resist compliance on four grounds: (1) that the Commission lacks jurisdiction over aluminum wiring systems because they are not "consumer products" within the meaning of the Consumer Product Safety Act, and, in any case, the court is bound on a collateral estoppel basis by a prior ruling on this point; (2) that the Commission has issued investigatory subpoenas in what is an essentially adjudicatory proceeding without providing the protections of the adjudicative rules to respondents; (3) that the subpoenas may not be enforced in the absence of published procedural regulations; and (4) that the subpoenas unlawfully attempt to apply the Consumer Product Safety Act retrospectively.

 The court has but a limited role to play in the enforcement of administrative subpoenas. The scope of issues that can be litigated in an enforcement proceeding is narrow, because of the Government's interest in expeditious investigation to carry out its congressionally mandated duties. *See United States v. Morton Salt Co.*, 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950); *Oklahoma Press Publishing Co. v. Walling*, 327

1. Use of aluminum home wiring is a relatively recent phenomenon, achieving popularity in the mid-1960s as copper shortages increased and price of copper wiring. Reports of incidents concerning aluminum wiring, including fire, smoke, sparks, and damage to insulation, led to new performance standards for such wiring by Underwriters' Laboratory and induced some localities to ban aluminum branch circuit wiring in residential construction. *See* National Bureau of Standards, *Hazard Assessment of Aluminum Electrical Wiring in Residential Use*, Report No. 75–677 (Dec. 1974).

2. *See* Memorandum Decision and Order, Consumer Product Safety Commission (Dec. 2, 1976).

U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946); *Endicott Johnson v. Perkins*, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943); *Federal Trade Commission v. Texaco*, No. 74–1547, 180 U.S.App.D.C. 390, 555 F.2d 862 (Feb. 23, 1977) (en banc). And although the court's function is "neither minor nor ministerial," [3] it need ascertain only whether "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *United States v. Morton Salt Co., supra*, 338 U.S. at 652, 70 S.Ct. at 369. In addition, a respondent may challenge an agency's exercise of its subpoena power on the ground that it is unreasonable, *i. e.*, unduly burdensome. *Oklahoma Press Publishing Co. v. Walling, supra*, 327 U.S. at 208, 66 S.Ct. 494; *Federal Trade Commission v. Texaco, supra*, 180 U.S.App.D.C. at 409, 555 F.2d at 881. Enforcement proceedings of this sort generally are summary in nature. *Federal Trade Commission v. Texaco, supra*, 180 U.S.App.D.C. at 410, n. 48, 555 F.2d at 882 n. 48; *see* Fed.R.Civ.P. 81(a)(3) (court may order that *Federal Rules* inapplicable to subpoena enforcement action). With these general principles in mind, the court may evaluate the defenses raised by respondents in this action.

## I. *Aluminum Wiring as a "Consumer Product"*

■ Respondents challenge the statutory authority of the Commission to investigate aluminum home wiring systems on the ground that such wiring is not a "consumer product" within the meaning of section 3(a)(1) of the Consumer Product Safety Act, 15 U.S.C. § 2052(a)(1).[4] Alternatively, even if this court should disagree with respondents' interpretation of what qualifies as a "consumer product," respondents argue that the court nevertheless is bound by the recent decision of the district court in Delaware, finding aluminum home wiring systems to be outside the definition of consumer products under the Act, on collateral estoppel principles. *Kaiser Aluminum & Chemical Corp. v. Consumer Product Safety Commission*, 428 F.Supp. 177 (D.Del.1977).

### A. *Statutory Definition of Consumer Product*

■ Section 3(a)(1) of the Act provides: The term "consumer product" means any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise.

15 U.S.C. § 2052(a)(1). Respondents do not allege the applicability of any of the speci-

---

**3.** *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 217 n. 57, 66 S.Ct. 494, 90 L.Ed. 614 (1946).

**4.** The court believes that this defense is properly presented in an enforcement action as it relates directly to the authority of the agency to conduct such an investigation. *See Morton Salt, supra*, 338 U.S. at 652, 70 S.Ct. 357; 15 U.S.C. § 2054(b)(1). The Commission is permitted to investigate the safety of "consumer products" under the Act; such a provision should be read as a limitation on the Commission's power of investigation. *Compare* 15 U.S.C. § 2054(b)(1) (Consumer Product Safety Commission may investigate safety of consumer products) *with* 15 U.S.C. § 46(a) (FTC given broad power to investigate "organization, business, conduct, practices, and management" of companies). Although the Commission argues that the issue is one of statutory coverage and thus inappropriate for determination at the subpoena enforcement stage, *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946), the question more accurately is labeled one of statutory authority in light of the express limitation on investigations imposed by 15 U.S.C. § 2054(b)(1). And reading the Act as a whole, the court hardly can conclude that 15 U.S.C. § 2076(b) adds in any significant way to the Commission's power of investigation. Moreover, in the instant case, unlike in *Oklahoma Press* and its progeny, the Commission does not need enforcement in order to determine facts about respondents' activities that might establish the Commission's jurisdiction. The essential facts are not in dispute. The issue is purely legal: whether aluminum home wiring systems constitute "consumer products" under the Act. *See FTC v. Miller*, 549 F.2d 452, 460–61 (7th Cir. 1977).

cally enumerated exceptions to the definition of consumer products. *Id.* §§ 2052(a)(1)(A)–(a)(1)(I). The key question therefore becomes whether aluminum home wiring systems are "articles . . . for use in or around . . . a residence." The plain words of the statute suggest an extremely broad definition of consumer products. It seems clear that aluminum wiring systems are "for use in . . a residence." One uses a wiring system each time he turns on a light or plugs in a toaster. By definition, home wiring systems are used in residences. Certainly such systems qualify as "articles." The respondents contend, nevertheless, that the plain words of the Act exclude wiring systems because they are component parts of a home.[5] As integral parts of finished residences, respondents suggest that they are part of a home and not for use in a home. *See Kaiser Aluminum & Chemical Corp. v. Consumer Product Safety Commission*, 428 F.Supp. at 181 (D.Del.1977). Yet respondents offer no convincing reasons why the two concepts are mutually exclusive. Wiring systems do not logically fail to qualify as articles for use in residence solely because they are component parts of a house; the definition of consumer product in the Act is sufficiently broad to cover aluminum home wiring systems. For these reasons, the plain words of the Act do not support respondents' interpretation of the definition of a consumer product.

Next respondents rely on the legislative history of the Act to support their contention that aluminum home wiring systems do not qualify as consumer products. The legislative history, however, is at best inconclusive on that question.[6] The Senate Report notes:

> Because the product safety authority is designed to be comprehensive in its scope, the definition of "consumer product" by necessity is comprehensive. Rather than

attempt to catalogue those items included within the concept of "consumer product," paragraph (1) of section 101 catalogues those products which are not "consumer products."

S.Rep. No. 749, 92d Cong., 2d Sess. 12 (1972). Similarly, the House Report states:

> Because it [the bill] is intended to vest omnibus product safety authority in a single Federal agency, the definition is broadly stated. . . .

H.R.Rep. No. 1153, 92d Cong., 2d Sess. 27 (1972). Certainly these indicate a Congressional intent that the term be interpreted in a "broad" and "comprehensive" manner. Respondents counter the undisputed expressed intent for a broad definition of consumer product with two arguments.

■ First, respondents note that proposed amendment to the Senate bill, which would have included mobile homes within the definition of consumer products, was defeated. *See* 118 Cong.Rec. 21897–901 (1972). From this, respondents draw the conclusion that Congress intended to exclude housing from the definition. Yet even in the defeat of the amendment, it was clear that "components" of mobile homes would be covered by the definition. H.R.Rep. No. 1153, *supra*, at 28; 118 Cong. Rec. 21899 (1972) (remarks of Senator Brock). In the present case the question similarly is not whether a house is a consumer product but rather whether a component of it—the wiring system—so qualifies. *See* note 5 *supra*. Therefore, the defeat of this amendment in the Senate does not provide conclusive evidence of Congressional intent to exclude aluminum wiring systems from the broad definition of consumer product.

■ Second, respondents argue that aluminum home wiring systems are "industrial products" rather than consumer products and that Congress exhibited an intention to

---

5. At one point, respondents suggest that such wiring systems "*are* the home." The court need not hesitate to conclude that wiring systems and houses are not identical; therefore, the court will consider respondents' claims on a "component part" basis.

6. Indeed, the only explicit mention of aluminum home wiring during a significant part of the legislative consideration would suggest its inclusion within the definition. 118 Cong.Rec. 31378 (1972) (remarks of Representative Moss).

exclude industrial products from the definition of consumer products. Indeed, such was the Congressional intent. S.Rep. No. 749, *supra*, at 12; H.R.Rep. No. 1153, *supra*, at 27. Respondents misinterpret, however, the meaning Congress intended for the term industrial product. The Senate Report notes that an industrial product personally used would be included within the definition of consumer product. S.Rep. No. 749, *supra*, at 12. The House Report concurs:

> [P]roducts which are primarily or exclusively sold to industrial or institutional buyers would be included within the definition of consumer product so long as they were produced or distributed for use of consumers.

H.R.Rep. No. 1153, *supra*, at 27. Thus the essence of the industrial product exclusion centers on its lack of use "in or around a residence" and not on whether it is purchased and installed by the construction industry. By definition, aluminum *home wiring* systems are used by consumers in their residences; such wiring is not within the scope of the definition Congress intended for industrial products when it defined a consumer product. The court, accordingly, rejects the second inference respondents would have it draw from the legislative history.

■ Respondents raise several additional arguments in support of their claim that aluminum home wiring systems do not qualify as consumer products. They assert that passage of the Housing and Community Development Act of 1974, Pub.L. No. 93–383, which created the National Institute of Building Sciences (NIBS) and included the Mobile Home Act, demonstrates Congress' continued intent to leave regulation of housing construction to state and local jurisdictions. NIBS has an essentially advisory role under the Act, which does not formulate federal standards for building and housing codes. Nonetheless, the Act recognizes a federal presence in the area, including, arguably, the role to be played by the Consumer Product Safety Commission. *See* 12 U.S.C. § 1701j. Federal standards were in fact contemplated for mobile homes under the Mobile Home Act. *See* 42 U.S.C. § 5403. On the whole, the court finds neither the institution of NIBS nor the Mobile Home Act to contain particularly persuasive evidence of an earlier Congressional intent to limit the Commission's jurisdiction under the Consumer Product Safety Act. Indeed, the CPSA itself notes the inadequacy of existing state and local regulations in many areas. 15 U.S.C. § 2051(a)(4), (b)(3). Later Congressional action in areas that are related but not identical provide only marginal evidence of Congress' intent at the time of passage of the Act.[7]

■ The court finds respondents' remaining contentions on the issue of statutory definition to be without merit. They suggest that inclusion of aluminum wiring systems as consumer products would be inconsistent with other provisions of the Act. Since the Act regulates manufacturers, distributors, retailers, and private labelers and since no one can be a distributor, retailer, or private labeler (or manufacturer under the normal meaning of that word) of a wiring *system*, respondents reason that the Act—read as a whole—precludes inclusion of aluminum wiring systems as consumer products. This argument ignores the fact that

---

**7.** The court is aware that Judge Stapleton in Delaware reached the opposite conclusion on the import of Congress' action in creating NIBS. *Kaiser Aluminum & Chem. Corp. v. CPSC*, 414 F.Supp. 1047, 1060–61 (D.Del.1976). Judge Stapleton relies heavily on the intent of Congress not to preempt state and local building codes by instituting NIBS; he did not discuss, however, that Act's recognition of an existing federal presence in the area. Moreover, this court does not conclude that the subsequent actions of Congress clearly demonstrate its intention to include aluminum wiring as a consumer product, but only that creation of NIBS is inconclusive on that point.

Respondents cite one additional statute that establishes the National Fire Prevention and Control Administration, 15 U.S.C. §§ 2201–19, in support of their position. For the same reasons enumerated above, this statute does not indicate a clear Congressional intent to exclude the Commission's jurisdiction over aluminum wiring even though it does reject the opportunity to promulgate national fire safety codes.

many companies are manufacturers, distributors, or retailers of aluminum wiring and electrical devices, and as such are potentially subject to regulation should safety standards be issued for those products. Finally, respondents assert that Congress did not unambiguously demonstrate its intent to displace local regulatory systems concerning wiring. Congress should convey such a purpose clearly. *United States v. Bass*, 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). Here, however, it is clear that Congress intended to vest one federal agency with omnibus consumer product safety authority. The Commission is clearly intended to override inadequate and conflicting state and local regulation. 15 U.S.C. § 2051.

 Several other factors militate in favor of finding aluminum home wiring systems to be included as consumer products. Remedial safety legislation such as the Act should be broadly construed to effectuate its purpose. *Tcherepnin v. Knight*, 389 U.S. 332, 333, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). The court should not create a loophole that might work to the injury of public protection through a technical construction. *Kordel v. United States*, 335 U.S. 345, 349, 69 S.Ct. 106, 93 L.Ed. 52 (1948). This interpretation of the Act would help to render the statutory design effective in terms of the policies behind its enactment. *National Petroleum Refiners Association v. FTC*, 157 U.S.App.D.C. 83, 482 F.2d 672 (1973), *cert. denied*, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974). Moreover, the Commission's initial jurisdictional determination that is, as here, consistent with the goals and policies manifested in the statute should be accorded great weight. *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1962). For these reasons the court should not prohibit the Commission from investigating aluminum home wiring systems.

### B. *Collateral Estoppel*

Respondents contend that even if this court were inclined to find that aluminum home wiring systems qualified as consumer products under the Act it is precluded from making such a finding because of Judge Stapleton's decision in *Kaiser Aluminum & Chemical Corp. v. Consumer Product Safety Commission*, 428 F.Supp. 177 (D.Del.1977). In *Kaiser* the court concluded that the Commission lacks jurisdiction over aluminum home wiring. Respondents argue that the Commission is collaterally estopped from relitigating this identical jurisdictional issue in the present action.[8] Before the court considers whether the defense of collateral estoppel has merit in the circumstances of this case, it first must decide whether the defense may be raised at all in the context of a subpoena enforcement action.

 The Government suggests that the defense of collateral estoppel is inappropriately raised in a subpoena enforcement action. *Federal Trade Commission v. Texaco*, 180 U.S.App.D.C. at 407, 555 F.2d at 879 (1977) (en banc); *Federal Trade Commission v. Feldman*, 532 F.2d 1092 (7th Cir. 1976); *Federal Trade Commission v. Markin*, 532 F.2d 541 (6th Cir. 1976). Yet the court in *Texaco* refused to announce a general rule that a collateral estoppel defense could not be raised in a subpoena enforcement action. 180 U.S.App.D.C. at 408 n. 42, 555 F.2d at 880 n. 42. Moreover, the court in *Texaco* considered a claim that an action taken by another agency—the Federal Power Commission—should be given collateral estoppel effect. Here it is a court decision for which collateral estoppel effect is claimed. Moreover, since the question at hand is a narrow legal question, the court need not "preview the ultimate complaint" in any real sense in order to assess the collateral estoppel claim. *FTC v. Texaco, supra*, 180 U.S.App.D.C. at 407, 555 F.2d at 879. Indeed, unlike in *Texaco, Feldman,*

---

**8.** Respondent Kaiser, party plaintiff in the Delaware action, first raised the collateral estoppel defense. Subsequently, all other respondents filed a supplemental memorandum with the court detailing their collateral estoppel claim.

Legal differences between Kaiser's position and those of the other respondents, who were not parties to the Delaware action, will be analyzed by the court *infra*.

and *Markin*, the Commission here does not need the opportunity to make a variety of factual determinations pursuant to its investigation before resolving this particular claim of collateral estoppel. As noted *supra*, whether aluminum wiring systems qualify as consumer products under the Act presents a discrete legal question; the essential nature of such wiring systems is not in dispute for purposes of that question. Thus the court sees little reason to restrict inquiry into this type of collateral estoppel claim, even in the context of a subpoena enforcement action.

 Although the doctrine has been variously stated, the principle of collateral estoppel requires a final determination of some question in dispute between parties or their privies:

> Where there is a second action between parties, or their privies, who are bound by a judgment entered in a prior suit, but the second action involves a different claim, cause, or demand, the judgment in the first suit operates as a collateral estoppel as to, but only as to, those matters or points which were in issue or controverted and upon the determination of which the initial judgment necessarily depended.

1B J. Moore, *Federal Practice* ¶ 0.441[2], at 3777 (1976); *see* Restatement of Judgments § 70, Comment b (1942). Collateral estoppel will not operate if the issues are not the same in the second suit as in the first, but a mere "incorrect" result in the first suit will not affect its conclusiveness. *Id.* at 3777–78. The Government initially contends that there exists a lack of identity of issue between the first and second suits here. While it admits that Judge Stapleton in Delaware did decide the issue of whether aluminum wiring was a consumer product under the Act, the Government notes that Judge Stapleton did not consider the question of whether electrical devices connected to such wiring were consumer products. Accordingly, the Government reasons that there is no identity of issue between the

first and second suits as to the nine device manufacturer respondents and thus no collateral estoppel effect in Judge Stapleton's decision as to them. This claim has merit. A fair reading of Judge Stapleton's decision makes clear that the only issue actually litigated in Delaware related to aluminum wiring and not electrical devices. No collateral estoppel effect should be accorded to an issue not actually litigated. *See* Restatement (Second) of Judgments § 68, comment *e*, at 151–53 (Tent. Draft No. 1, 1973).

 The Government also argues for adoption of a strict mutuality of estoppel rule in order to limit any possible collateral estoppel effect to Kaiser, the only respondent that was a party to the Delaware litigation. The Government cannot deny, however, that the doctrine of strict mutuality has significantly eroded in recent years. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *Bernhard v. Bank of America National Trust & Savings Association*, 19 Cal.2d 807, 122 P.2d 892 (1942). Whether *Blonder-Tongue* mandates a new approach to questions of mutuality in the circumstances of this case is not entirely clear. The Court expressly noted that the doctrine was not before it for "wholesale approval or rejection." 402 U.S. at 327, 91 S.Ct. 1434. The Court hinged its decision in large part on the peculiar complexity of patent law and policy reasons for not permitting relitigation of patent validity after a federal court has found the patent invalid. *Id.* at 327, 331–50, 91 S.Ct. 1434. And although respondents in their brief appear to suggest that the California Supreme Court's decision in *Bernhard* represents the state of the federal law today, it is clear that *Blonder-Tongue* is not a wholesale rejection of the requirement of mutuality. The Second Circuit has examined the effect of *Blonder-Tongue* on collateral estoppel questions involving the Internal Revenue Service. *Divine v. Commissioner of Internal Revenue*, 500 F.2d 1041 (2d Cir. 1974).[9] In *Divine* the court rejected the

---

**9.** *See generally* Note, *Collateral Estoppel: Loosening the Mutuality Rule in Tax Litigation,* 73 Mich.L.Rev. 604 (1975); Comment, 60 Iowa L.Rev. 1420 (1975).

taxpayer's argument that a Seventh Circuit decision adverse to the IRS on an identical substantive tax issue collaterally estopped the IRS from litigating the issue again before the Second Circuit. Finding that the doctrine of strict mutuality has not met its demise, the court distinguished *Blonder-Tongue* as resting on factors peculiar to patent validity relitigation. The present case has certain similarities to *Divine*. Although not presenting a tax issue, the legal question here is of sufficient importance and complexity that, as a matter of policy, inquiry by other circuits should not be foreclosed; indeed, a conflict among the circuits could be a healthy matter on a question going to the heart of the Commission's jurisdiction. *See* 500 F.2d at 1049–50. No complicated factual determinations have been made, unlike in *Blonder-Tongue*. Moreover, application of collateral estoppel principles in this case would not result in vindication of the policies the Second Circuit identified as supporting the rule:

> The rule developed as a means of protecting a person from legal harassment and redundant legal fees. Divine will be subject to neither.

500 F.2d at 1050. Similarly, the respondents other than Kaiser will be subject to neither. Here, investigation of aluminum wiring systems for possible safety hazards presents a question of obvious public concern. For these reasons the court is not convinced that a single district court decision concerning a single wire manufacturer should preclude the Commission from all investigation of possible safety hazards in aluminum wiring systems. Therefore the court will require strict mutuality in the somewhat unusual circumstances of this case.

■ As to respondent Kaiser, however, the court finds that all the elements required to invoke a collateral estoppel de-

fense have been demonstrated. There is an exact identity of issue: whether aluminum wiring is a consumer product under the Act.[10] A final judgment has been rendered by the Delaware court on this issue. And the parties to this second suit are identical to those in the first suit: Kaiser and the Commission. Thus, even if this court disagrees with the conclusion of the court in Delaware, Judge Stapleton's decision is conclusive.

## II. *Adjudicatory Protections*

Respondents contend that these "investigatory" subpoenas have been issued substantially subsequent to the investigatory phase of this proceeding. They suggest that the regulatory machinery already has been set in motion and that the proceedings have taken on the character of an administrative adjudication. Since the proceedings have entered adjudication, respondents assert prejudice in the Commission's failure to follow the strict rules of discovery and to permit procedures for reciprocal discovery applicable to adjudications. The court does not believe that the proceedings have entered the adjudicatory phase and therefore need not consider whether respondents have been prejudiced to the extent that the subpoenas should be considered unlawful.

■ Respondents admit that there has been no issuance and service on respondents of a Notice of Enforcement. The Commission's adjudicative rules state that an adjudication is commenced by issuance and service of such a notice by Commission staff with the approval of the Commission. 39 Fed.Reg. 26851 (July 27, 1975). Respondents rather appear to argue for some concept of constructive adjudication. They point to certain minutes of an Executive Session of the Commission authorizing the staff to "prepare" an appropriate Notice of

---

10. That the question decided in Delaware was legal rather than factual does not affect the claim of collateral estoppel. Questions of statutory construction qualify for collateral estoppel effect so long as the elements of that doctrine are met and no injustice would result

from its application. Restatement of Judgments § 70 (1942). Here the court is presented the same legal claim based on the same historical fact. *See Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 601, 68 S.Ct. 715, 92 L.Ed. 898 (1948).

Enforcement.[11] The plain fact remains, however, that no Notice of Enforcement has been issued. Respondents cite no case supporting their theory that adjudication can begin before filing of an administrative complaint; the Supreme Court's decision in *Hannah v. Larche*, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960), on the other hand, suggests that mere claims of prejudice resulting from investigation do not invoke the procedural protections of adjudication. In *Hannah* the Court rejected a due process attack on the actions of an agency that held investigative, but not adjudicative, power on the ground that it would "make a shambles of the investigation and stifle the agency in its gathering of facts." *Id.* at 444, 80 S.Ct. at 1515. Similarly, a court could stifle legitimate investigation by concluding that adjudicatory protections should apply even in advance of the necessary first step of issuing a Notice of Enforcement. By analogy, under Federal Trade Commission practice, "there is no shift from the investigative to the adjudicative stage until a complaint is issued . . ." *Genuine Parts Co. v. Federal Trade Commission*, 445 F.2d 1382, 1388 (5th Cir. 1971). For these reasons, the court rejects respondents' theory of constructive adjudication and finds that the Commission's actions do not enter the adjudicatory phase until issuance of a Notice of Enforcement.

### III. *Publication of Procedural Regulations*

 Respondents also contend that the Commission is precluded from seeking enforcement of these subpoenas because it lacks published rules pertaining to investigations. The Administrative Procedure Act requires publishing of rules of procedure in order to avoid potentially arbitrary *ad hoc* determinations. 5 U.S.C. § 552(a); *see Morton v. Ruiz*, 415 U.S. 199, 232, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). The APA contains an important exception to this general

rule: no one may be adversely affected where a required publication has not occurred "except to the extent that a person has actual and timely notice of the terms thereof." 5 U.S.C. § 552(a)(1). Actual and timely notice should be interpreted to mean that the agency must be "precise, timely, and informative" with respect to the procedures. *Northern California Power Agency v. Morton*, 396 F.Supp. 1187, 1191 (D.D.C. 1975), aff'd, 176 U.S.App.D.C. 241, 539 F.2d 243 (1976). In the present case, all respondents had at least six weeks actual notice of the Commission's adoption of the Federal Trade Commission's rules governing investigational subpoenas for purposes of this investigation before the return date of the subpoenas. No suggestion is made that the FTC rules are not precise or informative, and six weeks is sufficient time to meet the requirement of timely notice. Having actual and timely notice of the procedural rules, therefore, respondents have not demonstrated the invalidity of the challenged subpoenas.

### IV. *Retroactive Application of the Act*

 Respondents finally contend that the present subpoenas represent an impermissible attempt to apply section 15 of the Consumer Product Safety Act retroactively, because the aluminum home wire systems under investigation all were manufactured and installed before the effective date of the Act. Although the parties tend to merge the two questions, the issue before the court is not whether the Commission is empowered to regulate these wiring systems under section 15 of the Act but whether the Commission has the authority to investigate such systems. The court decides only the latter question. It is clear that the Commission is not limited in its investigations only to those matters that it subsequently can regulate under section 15 of the Act. Rather, the Commission is given broad power to "conduct research, studies,

**11.** Respondents also focus on language in the August 7, 1975 Executive Session meeting where the Commission "found" and had "reason to believe" that aluminum home wiring presented a risk. Additionally, respondents

point to a staff memorandum and a partial denial of a Freedom of Information Act request in support of their contention that the proceeding has progressed to the adjudicatory phase.

and investigations on the safety of consumer products and on improving the safety of such products." 15 U.S.C. § 2054(b)(1).[12] Such studies and investigations certainly could prove valuable to the Commission, the public, and manufacturers even if no section 15 regulation ultimately is sought. For this reason the Commission has the power to investigate such wiring systems regardless of when they were manufactured and installed; respondents' claim of retroactive application of the Act is raised prematurely in a subpoena enforcement proceeding. Their retroactivity claim should be raised when and if the Commission seeks to institute a regulatory action under section 15.

12. This court already has concluded that aluminum home wiring systems qualify as consumer products under the Act. *See* § IA *supra*.