**CONSUMER PRODUCT SAFETY COMMISSION, Plaintiff,**

v.

**CHANCE MANUFACTURING CO., INC., et al., Defendants.**

Civ. A. No. 77–1581.

United States District Court, District of Columbia.

Nov. 23, 1977.

Mana L. Jennings, Eric L. Stone, Product Defect Correction Division, Compliance & Enforcement, Consumer Product Safety Commission, Washington, D. C., for plaintiff.

Richard H. Gimer, Washington, D. C., Douglas Norris, Cambridge City, Ind., Olin H. Mabry, pro se, John A. Borsari, Jeffrey R. Whieldon, Washington, D. C., B. G. Stephenson, Arlington, Va., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

The Consumer Product Safety Commission (CPSC) has filed this action against the manufacturer and commercial operators of an amusement park ride known as the Zipper, on the ground that the Zipper is an "imminently hazardous consumer product" within the meaning of Section 12(a) of the Consumer Product Safety Act of 1972, 15 U.S.C. § 2061(a) (Supp. III, 1973). Section 12(b)(1) empowers the District Court in which the CPSC files such an action to declare the product in question "imminently hazardous" and issue such temporary and permanent relief as the Court deems necessary to protect the public from the risks associated with the product. 15 U.S.C. § 2061(b)(1).

Defendant Chance Manufacturing Company has moved for dismissal on the ground that the Zipper is not a "consumer product" within the meaning of the Act, and hence that the Court lacks jurisdiction over the subject matter. The CPSC, on the other hand, has moved for partial summary judgment on the issue of subject matter jurisdiction. Because the parties agree on the nature and qualities of the Zipper machine, and the uses to which it is put, the jurisdictional issue is exclusively one of law. *Kaiser Aluminum & Chemical Corp. v. CPSC*, 414 F.Supp. 1047, 1056 (D.Del.1976).

### 1. *Background.*

The Consumer Product Safety Commission came into being October 27, 1972, with the passage of the Consumer Product Safety Act. Pub.L. No. 92–573, 86 Stat. 1207 (codified at 15 U.S.C. §§ 2051–81 (Supp. III 1973)), *amended by* Consumer Products Safety Commission Improvements Act of

1976, Pub.L. No. 94–284, 90 Stat. 503).[1] Among the congressional findings upon which the legislation rests are that "an unacceptable number of consumer products which present unreasonable risks of injury are distributed in commerce" and that "the public should be protected against unreasonable risks of injury associated with consumer products . . ." *Id.* § 2(a)(1), (3), 86 Stat. 1207, 15 U.S.C. § 2051(a)(1), (3). The Commission's mandate under the 1972 Act extends to conducting research and investigations on the safety of consumer products, *id.* § 5(b), 86 Stat. 1211, 15 U.S.C. § 2054(b); promulgating safety standards for consumer products, *id.* §§ 7, 9–11, 86 Stat. 1212, 1215–18, 15 U.S.C. §§ 2056, 2058–60, and proceeding in court against imminently hazardous consumer products, and those who manufacture, distribute and retail them. *Id.* § 12, 86 Stat. 1218, 15 U.S.C. § 2061. The prime substantive delimitation of the CPSC's jurisdiction derives from the Act's definition of the term "consumer product":

> The term "consumer product" means any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise . . . 15 U.S.C. § 2052(a)(1).

The Act incorporates numerous exclusions from the definition, some of which are defined in terms of particular products, such as tobacco, motor vehicles, aircraft, boats, drugs, and food, 15 U.S.C. § 2052(a)(1)(B), (C), (F) to (I), and others of which are defined in terms of other regulatory legislation. *Id.* § 2080. Under the latter type of exclusion, therefore, if the risk associated with a consumer product could be eliminated or sufficiently reduced by action taken under the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651 *et seq.*, the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011 *et seq.*, or the Clean Air Act, 42 U.S.C. §§ 1857 *et seq.*, the CPSC lacks authority to regulate the risk. 15 U.S.C. § 2080. Other provisions of the Act define "manufacturer" as one who manufactures or imports a consumer product, including production and assembly, 15 U.S.C. § 2052(a)(4), (8), and a "retailer" as one "to whom a consumer product is delivered or sold for purposes of sale or distribution by such persons to a consumer" *Id.* § 2052(a)(6). The term "consumer" is nowhere defined in the Act.

Against this statutory backdrop the CPSC brought this action pursuant to 15 U.S.C. § 2061(b)(1) against Chance Manufacturing Company, manufacturer of the Zipper ride, and a group of persons and enterprises alleged to be distributors and retailers, within the meaning of the Act, of the Zipper ride. The Zipper itself has been designed and manufactured solely by the Chance company, which since 1968 has sold 93 Zippers, 80 of which remain in operation. Affidavit of Richard G. Chance, Vice President and General Manager, Chance Manufacturing Co., Inc., at 2 (Oct. 7, 1977) (hereinafter Chance Affidavit). Weighing a total of 42,000 pounds, the Zipper consists primarily of a boom which rotates in a 360° arc when the machine is operating. *Id.* at 3. Affixed to the boom at equidistant points are 12 cars, each accommodating 2–3 persons, which move along the boom and themselves rotate through the 360° arc. The Zipper is loaded with passengers by one or more operators, who rotate the cars one by one to the loading platform, open the door on each car, and assist the passengers inside the cars. *Id.* When the operator closes the door, a padded lap bar comes into place across the laps of the riders. *Id.* Each car has two external latching systems to keep the car door closed during the ride. *Id.* Once inside the cars, the riders have no

---

1. The Senate bill which culminated in the Act was itself an outgrowth of the two-year investigation into consumer product safety conducted by the National Commission on Product Safety, a bipartisan body appointed in 1967. *See* S. 3419, 92d Cong., 2d Sess. (1972); 118 CONG. REC. 21847 (1972) (remarks of Sen. Magnuson).

control over the operation of the ride. *Id.* All 93 Zipper sales to date were made to commercial enterprises for operation at amusement parks, fairs and carnivals. *Id.* at 2. The "imminent hazard" alleged by CPSC to be presented by the Zipper ride is the occasional failure of some door latching systems during operation. The Commission alleges that at least four Zipper riders have died, and two have sustained serious injury, in falls which occurred when the doors of the Zipper cars in which they were riding opened in mid-air. The CPSC asks the Court to declare the Zipper an "imminently hazardous consumer product," 15 U.S.C. § 2061(a), and to enjoin operation of any Zipper until corrective action satisfactory to the CPSC has been taken. The CPSC seeks also the costs of its investigation and this action.

The Chance company and those of the other defendants which have responded formally to date have addressed only the question of the Commission's jurisdiction. Their assertion is simply that the Zipper is not a "consumer product" within the meaning of the Act, and hence that the defendants are not manufacturers, distributors, or retailers subject to the Act. Our discussion accordingly is confined to that issue.

### 2. *Jurisdiction.*

Because the Zipper ride has never been sold to individual consumers nor used except in recreation, the operative portion of the Act's definition of "consumer product" is that which covers articles produced or distributed "for the personal use, consumption or enjoyment of a consumer . . . in recreation, or otherwise . . ." 15 U.S.C. § 2052(a)(1)(ii). The ambiguity of the definition impels us, as it has other courts, to resort to such extrinsic sources as the Act's legislative history and judicial applications of the Act for aid in determining whether the statutory definition of "consumer product" comprehends the Zipper ride. *See United States v. The Anaconda Co.,* Misc. No. 77–24, at 5–6 (D.D.C. June 15, 1977), *appeal docketed,* No. 77–1628 (D.C. Cir. July 18, 1977) (hereinafter "Anaconda"); *Kaiser Aluminum & Chem. Corp. v. CPSC,* 428 F.Supp. 177, 181 (D.Del.1977)

(hereinafter "Kaiser II"); *Kaiser Aluminum & Chem. Corp. v. CPSC,* 414 F.Supp. 1047, 1059 (D.Del.1976) (hereinafter "Kaiser I").

The most unequivocal expression of congressional intent to be gleaned from the legislative history of the Act is that the definition of "consumer product" be construed broadly to advance the Act's articulated purpose of protecting consumers from hazardous products. The report of the Senate Committee on Commerce, for example, points out that, rather than attempting "to catalogue those items included within the concept of 'consumer product,'" the Act's drafters chose to delineate the concept by excluding particular items from its range. S.Rep. No. 749, 92d Cong., 2d Sess. 12 (1972). Similarly, the report of the House Committee on Interstate and Foreign Commerce observes that the breadth of the definition reflects the purpose of Congress "to vest omnibus product safety authority in a single Federal agency." H.Rep. No. 1153, 92d Cong., 2d Sess. 27 (1972); *see also Kaiser I, supra* at 1059 (Congress contemplated that CPSC-approved standards would preempt the field). An additional factor in favor of an expansive interpretation of the Act generally is the Act's character as remedial legislation directed at a widespread, specifically identified threat to the public safety. *See United States v. An Article of Drug . . . Bacto-Unidisk,* 394 U.S. 784, 798, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969). To insure that the Commission remained fully capable of acting against evolving and unforeseen risks associated with consumer products, Congress provided that the Commission's jurisdiction as to a particular product would depend directly on the extent to which consumers were exposed to the risks associated with the product.

"[P]roducts which are primarily or exclusively sold to industrial or institutional buyers would be included within the definition of consumer product so long as they were produced or distributed for *use* of consumers. (Emphasis in original).

. . . If the manufacturer or distributor of an industrial product fosters or facilitates its sale to or use by consum-

ers, the product may lose its claim for exclusion if a significant number of consumers are thereby exposed to hazards associated with the product." H.Rep. No. 1153, *supra* at 27.

In light of the House Committee's additional statement that "[i]t is not necessary that a product be actually sold to a consumer, but only that it be produced or distributed for his use," *id.* it seems beyond dispute that Congress intended the Act's application to a given product to depend, less on how the product changes hands than on the degree to which it affects or endangers the safety of individuals in their capacity as consumers. This guiding principle forms the first of the two prerequisites to CPSC jurisdiction: That the product in question be either directly sold to the consumer or "produced or distributed . . . for the *personal* use, consumption or enjoyment of a consumer . . ." 15 U.S.C. § 2052(a)(1)(ii). (Emphasis added). The second prerequisite is that the product be sold, used, consumed or enjoyed in or around a "residence, a school, in recreation, or otherwise . . ." *Id.* The latter requirement, relating to the context in which the product is used, has not met with exhaustive treatment in the parties' submissions, apparently because none disputes that the Zipper ride is used "in recreation."

Rather, the jurisdictional controversy here has centered on whether the Zipper ride is produced or distributed for the "personal use, consumption or enjoyment of a consumer . . .." An analogous issue was at the crux of the decisions in *Anaconda* and *Kaiser*; that the courts in those cases reached opposite results with respect to CPSC jurisdiction over aluminum home wiring signifies how close the jurisdictional question frequently can be.[2] Such is the case here. Defendant Chance has pointed out that the report of the National Commission on Product Safety, which formed the basis of the 1972 Act, focuses on products which clearly are "consumer products," in the sense that each can be, and likely is,

possessed, controlled and otherwise used by a single individual or family. Among these are architectural glass, color television sets, fireworks, floor furnaces, glass bottles, high-rise bicycles, hot water vaporizers, household chemicals, infant furniture, ladders, power tools, protective headgear, rotary lawnmowers, toys, unvented gas heaters, and wringer washing machines. In support of its argument that the Zipper ride is not a consumer product, defendant relies on two New York decisions in which the courts held that no common law rights for breach of implied warranty of fitness attach to a ferris wheel and a ski lift respectively. *Albert v. State*, 80 Misc.2d 105, 362 N.Y.S.2d 341, 344–45 (1974), *aff'd* 51 A.D.2d 611, 378 N.Y.S.2d 125 (1976); *Shaw v. Fairyland At Harvey's, Inc.*, 45 Misc.2d 493, 257 N.Y.S.2d 552, 554–55 (1965), *aff'd* 26 A.D.2d 576, 271 N.Y.S.2d 70 (1966). Though these decisions are not determinative upon this issue of statutory construction, they support defendant's proposition that a ride on an amusement park ride or similar conveyance is but "an abstract right to occupy an amusement device." *Albert v. State, supra*, 362 N.Y.S.2d at 344. Further, defendant Chance cites section 15(d) of the Act, treating the duty to repair and refund, and legislative comments thereon, in arguing that a "consumer product" necessarily must come into a consumer's hands or otherwise be subject to his control. Toward the same end, defendant has designated as its Exhibit 2 a "Fact Sheet" circulated by CPSC to manufacturers, distributors and retailers of products under investigation by reason of defects. Defendant asserts that the Fact Sheet's request for information on the number of products "in consumers' hands" reflects the CPSC's own assumption that a "consumer product" *per se* must potentially be within a consumer's exclusive control or possession. The CPSC has countered these arguments with extracts from the legislative history suggesting that artificial football turf is a "consumer product" despite its history of sales primarily or exclusively to

---

**2.** The difference in results is best explained by the Delaware court's emphasis on a perceived congressional intent to defer to state and local building codes, thereby exempting such products as aluminum home wiring from the purview of the Act. *See Anaconda, supra* at 8 n.7; *Kaiser I, supra* at 1060–61.

commercial enterprises rather than consumers. *See* 118 CONG. REC. 31378 (1972) (remarks of Rep. Moss). The Commission also points to the determination of its own counsel that amusement rides lie within the Commission's jurisdiction. Advisory Op. No. 153, at 1 (Gen'l Counsel, Consumer Prod. Safety Comm'n, Nov. 13, 1974). As did Judge Stapleton in *Kaiser I,* however, we reject the idea that the Commission's undoubted expertise in such matters as the safety of a given product extends to the legal issue of its statutory jurisdiction over the same product. 414 F.Supp. at 1056.

■ It is perhaps a measure of the closeness of this question that the parties' arguments rest on clauses from Commission Fact Sheets and the perceived parallel between the Zipper ride and artificial football turf. While these points are symptomatic of the concerns and principles which underlie the Act, the determination of the jurisdictional question ultimately must be based on the Court's perception and understanding of the legislative purpose. As noted above, it was the intent of Congress to have the jurisdiction of the Commission turn, at least in part, on the extent to which consumers are exposed to the product. Further, though the products investigated by the National Commission on Product Safety all are normally controlled and possessed by individual consumers, the legislative history of the Act nowhere suggests that Congress intended to import a "control" requirement into the definition of the term "consumer product."

■ Cast in terms of the first of the two prerequisites to jurisdiction established in the definition, the question is whether the Zipper ride is produced or distributed for the personal use, consumption or enjoyment of its riders. While it may be argued that what is sold to the consumer is the "enjoyment of a ride," this does not counter the fact that the product is produced or distributed for the personal use or enjoyment of a consumer. Though the riders of the Zipper do not control it, own it, or otherwise possess it, their occupancy of its cars and concomitant exposure to whatever dangers it may present are sufficient to satisfy the "personal use, consumption or enjoyment"

clause of the definition. Moreover, though the Zipper may be sold and distributed exclusively to institutional buyers, such sale and distribution in a practical sense is to provide an opportunity for riders to use it.

■ The second prerequisite relates to the context in which the product is used. The phrase "in recreation, or otherwise" can be read either as modifying the preceding phrase, "in or around . . . a household or residence, a school," or as standing apart as an independent basis of jurisdiction. The former interpretation is not only a strained construction but would effectively limit the definition to household and school products, thereby excluding not only the Zipper ride, but also fireworks, bicycles, lawnmowers and other products investigated by the National Commission on Product Safety. The latter interpretation not only comports with the Act's remedial purposes, but also makes better grammatical sense.

The conclusion that the Zipper ride lies within the Commission's jurisdiction, as is apparent, rests on narrow grounds. It should not be deemed to cover, for example, injuries sustained by amusement park employees in the course of operating the ride, absent a showing that they were personally using or enjoying the ride in the sense that the riders were. Thus, if the risks associated with the ride threatened only employees, the holding above would not be authority for the Commission's assertion of jurisdiction. Similarly, any effort by the Commission to regulate such other forms of conveyance as elevators, escalators, subways, and trains, could find no support in the holding above; even if an individual's use of such conveyances constituted "personal use, consumption or enjoyment," a question on which we express no opinion, the contextual clause of the definition would require that the use of the product be "in or around . . . a household or residence, a school, in recreation, or otherwise." While the word "otherwise" might be applied to cover virtually any use of a product, such an obliteration of jurisdictional limits derives no discernible support from the legislative history. In contrast to a ride on a subway or elevator, which almost always is taken

for the ulterior purpose of reaching a destination, a ride on the Zipper machine is an end in itself. Because one rides the Zipper machine for its own sake and for the pleasure and thrill resulting therefrom, and not for any other purpose, it is used "in recreation."

The conclusion that the Zipper machine is subject to CPSC regulation does not, of course, suggest that there is necessarily any imminent hazard associated with the Zipper. That question remains to be decided.

An Order consistent with the foregoing has been entered this day.